attempting to influence the jury's deliberations in flagrantly improper ways.

The prejudice deriving from these errors requires that the conviction and sentence must be reversed.

Justice O'HERN joins in Part II of this dissent.

*For affirmance of conviction, reverse, sentence and remand*— Chief Justice WILENTZ, and Justices POLLOCK, GARIBALDI and STEIN—4.

*For reversal*—Justices CLIFFORD, HANDLER and O'HERN—3.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. JAMES E. ZOLA, DEFENDANT–APPELLANT.

Argued February 16, 1988—Decided August 16, 1988.
As Amended October 7, 1988.

386

388

*Claudia Van Wyk* and *Paul M. Klein*, Assistant Deputy Public Defenders, argued the cause for appellant (*Alfred A. Slocum*, Public Defender, attorney).

*Mildred Vallerini Spiller*, Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

O'HERN, J.

■ This is a pre-*Ramseur/Biegenwald* capital case in which the defendant was sentenced to death. In *State v. Biegenwald*, 106 *N.J.* 13 (1987), *appeal after remand*, 110 *N.J.* 521 (1988), and *State v. Ramseur*, 106 *N.J.* 123 (1987), we determined the constitutionality of New Jersey's capital punishment act, *N.J.S. A.* 2C:11–3, and established standards for its application. In this case, tried before those decisions, the jury charge failed to comply with the *Biegenwald* requirement that to impose the death penalty the jury must be convinced beyond a reasonable doubt that the statutory aggravating factors of *N.J.S.A.*

2C:11–3 outweigh the mitigating factors. The charge here would have permitted imposition of capital punishment on a finding that the aggravating and mitigating factors balanced. Therefore, the State agrees that a retrial of the penalty phase is required.

Our review, then, is limited to the guilt phase errors claimed by defendant. We find none that tainted the trial; we thus affirm the conviction of murder. We also affirm the related charges.

## I

This case arises from the particularly abhorrent killing of a frail 75-year-old widow who lived in a garden apartment complex where the defendant had been a caretaker. A neighbor saw the victim, Barbara Berrisford, return to her apartment from a hairdresser appointment on the morning of Thursday, January 13, 1983. Mrs. Berrisford's last known telephone conversation took place with her sister at 6:30 that evening; her sister later noted that Mrs. Berrisford had not sounded like herself and that her telephone had been hung up abruptly. Mrs. Berrisford did not attend her regular social meetings that Thursday afternoon and that Friday. The newspapers from January 14 to 17 piled up outside the apartment door; Mrs. Berrisford did not answer the door to pay the carrier.

On the morning of Monday, January 17, 1983, a worried neighbor had the superintendent of the complex enter the apartment. Mrs. Berrisford's body was found spread-eagled on her bed, clothed only in a girdle and wrapped in a sheet. Leather thongs had been tied to the victim's left wrist and right ankle; her right arm and left leg were found close to thongs attached to the corresponding corners of the bed. She had been wounded in the throat, in the left temple, and in the nose; her face had bled profusely; her throat and neck had been bruised.

Sixty percent of the victim's body was missing skin and showed signs of scalding; several pieces of the victim's skin

were found in the room. No sign of trauma to the victim's sexual organs was detected, nor was semen found in the victim's body. The County Medical Examiner ascribed her death to asphyxiation, which was later identified as the result of manual strangulation; the time of death was estimated to be late on Thursday, January 13. The victim's purse was missing and was never recovered.

An anonymous tip and a check of fingerprints and palm prints recovered at the crime scene led police to James Zola, a former maintenance man in the apartment complex. While employed by the complex, Zola's poor attempt to install Mrs. Berrisford's kitchen sink had led her to complain to his superior; Zola had later been fired, perhaps in part because of this complaint, along with other deficiencies in work habits.

The police arrested Zola at his mother's house on January 24, 1983. Pursuant to a search warrant, they found underwear and cigarettes that matched those recovered at the crime scene. They also found a pair of blue jeans that bore cat hairs comparable to those recovered from the underwear at the crime scene; these hairs were later found to match hair samples taken from the cat owned by defendant's female companion. The State's case was reinforced by evidence that Zola's own hairs matched those found at the crime scene on a bath mat, on a woman's blazer, on the thongs, and on the underwear. A neighbor of the victim recalled that on the morning of January 13 he had seen defendant peering from behind the door of an apartment near the victim's. The young woman who was living with defendant testified that he had been absent on the afternoon and evening of Thursday, January 13th, but that he had called her, and subsequently had returned home, in the early morning of Friday the 14th.

Defendant did not testify at trial, but through the testimony of a psychiatrist and a psychologist introduced his account of the killing: according to defendant, he had paranoically imagined, while under the influence of alcohol and drugs, that he was being pursued by police and police dogs. After taking

refuge in the basement of the apartment complex, defendant had broken into Mrs. Berrisford's empty apartment. His version was that when she returned he had grabbed her and asked her where the police were. To prevent Mrs. Berrisford from signaling the police, defendant tied her up and hit her head. Fearing that he had inflicted a fatal wound, defendant said that he had unsuccessfully attempted to revive Mrs. Berrisford, first by trying to give her food and drink, then by taking her clothes off and putting her in the shower. He said he went to check the door, leaving his victim in the bathtub with scalding water running; panicked by Mrs. Berrisford's condition when he lifted her out of the bathtub, he had put her on the bed to cover her up, and then had walked home in a daze and gone to sleep.

The jury found James Zola guilty of all counts charged: knowing and purposeful murder, burglary, aggravated sexual assault, kidnapping, and robbery. At the penalty phase, the State introduced certain photographs of the crime scene and relied on the other trial proofs to establish two aggravating factors: c(4)(g), that the murder was committed during a felony; and c(4)(c), that the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated assault to the victim. The defense sought to establish four mitigating factors: c(5)(a), that the defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution; c(5)(c), that the defendant was young (twenty-four years old) at the time of the murder; c(5)(d), that the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired as a result of mental disease or defect or intoxication, but not to a degree sufficient to constitute a defense to the prosecution; and c(5)(h), general factors relevant to the defendant's character or record or to the circumstances of the offense.

Defendant relied on the guilt phase testimony of defense experts who had described his broken home and troubled past:

as a youth defendant had been emotionally disturbed and addicted to drugs, and had been sexually abused several times. Defendant's son had died in 1981, possibly because of the drug addiction of defendant's then-wife. A psychiatric social worker whose testimony had been excluded as inexpert during the guilt phase corroborated this account from her own interviews with defendant and from her review of his state records. Defendant's father testified on his behalf, but defendant's mother became upset and left the courtroom. In addition, two clergymen who had visited defendant regularly since his arrest agreed that his turning to religion while incarcerated indicated his good potential for rehabilitation.

The trial court instructed the jury that in order to weigh a mitigating factor it must agree unanimously that the mitigating factor existed; the jury was also informed that a death sentence would result unless it determined that any mitigating factors it found outweighed aggravating factors. The jury found the emotional disturbance and catch-all mitigating factors and the two aggravating factors charged. It determined that the former did not outweigh the latter. Defendant was sentenced to death. He appeals to us under *Rule* 2:2–1(a)(3).

Defendant has raised various constitutional challenges to his conviction. Issues similar to those raised in *Ramseur* and *Biegenwald* will not be discussed extensively here, but will be noted for completeness of the record and preserved by discussion, *infra* at 439. We here discuss the challenges specific to his trial.

## II

### Pretrial errors claimed.

#### A.

Did the refusal to permit attorney-conducted *voir dire* violate defendant's constitutional right to a fair trial or otherwise restrict his opportunity to exercise challenges for cause or peremptorily?

*Voir dire* is a shorthand expression for the questioning of a pool of potential jury members to select impartial jurors to hear a case. The first aspect of defendant's challenge to this process was resolved by our decision in *State v. Biegenwald, supra,* 106 *N.J.* at 26–30. We there held applicable to capital cases the rule of *State v. Manley,* 54 *N.J.* 259 (1969), as well as *Rule* 1:8–3(a), which states that for the purpose of determining whether challenge should be interposed, "the court shall interrogate" the prospective jurors. *See also State v. Howard,* 192 *N.J.Super.* 571 (App.Div.1983) (attorney-conducted *voir dire* is not in itself part of the constitutional guarantee of fair trial).

■ At the same time, we reiterated our concern "that in capital cases trial courts should be especially sensitive to permitting attorneys to conduct some *voir dire.*" *Biegenwald, supra,* 106 *N.J.* at 30. Court-conducted *voir dire* is not an end in itself, but merely an efficient means to select an impartial jury. We note that in some cases a direct inquiry by counsel might replace the otherwise lengthy process of excusing jurors while court and counsel concur on a short follow-up question for the court to put to the recalled juror. The trial court allowing such direct inquiry would soon sense whether closer control of any counsel's questioning was required.

Before we address defendant's challenge to the scope of the court-conducted *voir dire,* a few words are in order about the general tenor of that process in this case. Although the trial court preferred to conduct all of the *voir dire,* it was sensitive to the nuances of the jurors' responses and in almost all instances receptive to counsels' suggestions regarding particular questions. In addition, the court implemented a form of "struck-jury" selection described in *State v. Ramseur, supra,* 106 *N.J.* at 239–43. Here the court undertook to qualify a panel of forty-eight jurors from which counsel would select the final jury. This was an especially time-consuming effort, we believe, because of the extensive pretrial publicity surrounding this case. The court reviewed its proposed general questions

and written questionnaire with counsel before *voir dire* commenced, and devoted twelve days to the selection of the jury in a thorough process marked by extensive cooperation with counsel.

As noted, the court was sensitive to the subtleties of the juror disqualification process and in this respect was fair to both the State and the defense. For example, it excused a juror who favored the death penalty, despite that juror's abjuring any commitment to impose that penalty "automatically" on a conviction of murder; it excused another juror who tried to rehabilitate herself after an initial response that she had thought "he was guilty" after reading about the case in newspapers; it retained a juror who would not impose the death penalty unless that sanction was justified by "overwhelming evidence" (not a statutory requirement), another who felt that "it would be extremely difficult" to impose the death penalty, and yet another who "didn't know if I could give somebody the death penalty"; it recalled another juror twice in response to attorney concern about the juror's answers to *voir dire* questioning.

There are some areas in which more inquiry would have undoubtedly been of assistance, as in the questioning of some jurors who expressed the view that capital punishment would be appropriate in some cases but not in others. It would have been better to know for certain whether rape-murder was the type of offense for which these jurors would apply the death penalty, and whether they would consider this sanction automatically justified by such offenses. Even when evaluating such situations, jurors must be able to follow the law and to weigh the factors prescribed by the capital punishment act.

We note that a particular juror cited in defendant's brief as being insufficiently questioned did have a tendency to answer the court in a "yes and no" fashion: although generally responding that she believed the death penalty was appropriate in some cases and not in others, she assured the court that she

could and would follow the law and impose a life sentence if the evidence justified that verdict.

Our review of the record assures us that at this initial phase of the trial the jurors fully understood that they would be given specific factors to guide them in the sentencing phase of the trial. The jurors all knew that this was a case of alleged rape-murder; they knew that they would be exposed to photographs that might shock them; they knew that the victim was elderly; they knew that they would be hearing testimony about narcotics; they knew that the case would turn in good measure on expert psychiatric evidence. Each juror was asked if he or she could evaluate such matters fairly and without predisposition. Some immediately and candidly told the court that they could not be impartial where drugs or rape or a helpless victim were allegedly involved. These jurors, as well as all whose professed lack of prejudice wavered on questioning, were discharged for cause.

We agree that it would have been appropriate for the court or for counsel to have asked additional open-ended questions directed to any specific feelings that the jurors may have had about capital punishment in the murder case before the court, which allegedly involved rape and robbery of the victim. On balance, however, "our independent review of the record reveals that the overall scope and quality of the *voir dire* was sufficiently thorough and probing to assure the selection of an impartial jury." *Biegenwald, supra,* 106 *N.J.* at 29. In addition, we are satisfied that no juror's attitude toward the death penalty portrayed the slightest bias in the guilt phase of the trial. As noted, the sentencing phase of this case must be retried.

### B.

Did the death-qualification process itself deprive defendant of an impartial trial because fourteen percent of the jurors questioned were excluded on the basis that they were unalterably opposed to the death penalty?

This general issue was resolved in *State v. Ramseur, supra,* 106 *N.J.* at 248–61. We add only that although this case was tried before *Ramseur,* the trial court, in evaluating juror qualifications, did not limit itself to considering whether jurors were so-called "*Witherspoon* excludables," i.e., whether they would "automatically" impose or reject the death penalty.

In *State v. Ramseur, supra,* 106 *N.J.* at 255–56, we traced the evolution of the standard for the exclusion-for-cause of jurors from *Witherspoon v. Illinois,* 391 *U.S.* 510, 88 *S.Ct.* 1770, 20 *L.Ed.*2d 776 (1968), through *Adams v. Texas,* 448 *U.S.* 38, 100 *S.Ct.* 2521, 65 *L.Ed.*2d 581 (1980), to *Wainwright v. Witt,* 469 *U.S.* 412, 105 *S.Ct.* 844, 83 *L.Ed.*2d 841 (1985). *Witherspoon* held that jurors who would automatically vote against the death penalty may be excused for cause. *Adams* and *Witt* modified *Witherspoon* by stating that "a prospective juror may be excluded for cause because of his or her views on capital punishment. That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Witt, supra,* 469 *U.S.* at 424, 105 *S.Ct.* at 852, 83 *L.Ed.*2d at 851–52 (citation omitted) (footnote omitted). In adopting the *Adams–Witt* modification of *Witherspoon* as applied to the opponents of capital punishment, we observed in *Ramseur* that the protection accorded to a defendant under the New Jersey Constitution was generally co-extensive with that under the federal Constitution. 106 *N.J.* at 251, 256.

Although *Witherspoon, Adams,* and *Witt* dealt with the exclusion of opponents of the death penalty, in *State v. Bey II,* 112 *N.J.* 123 (1988), we held that the same standard should apply to jurors who are proponents of the death penalty. Insofar as jurors' ability to follow the evidence is concerned, they are equally bound, "whether they are for or against the death penalty." *State v. Bey II, supra,* 112 *N.J.* at 152.

■ As noted in our discussion of the *voir dire* issue, the court in this case was equally fair to both sides in applying the *Bey II* standard to evaluate the impartiality of potential jurors. Indeed, defendant objected to the prosecutor's use of peremptory challenges to excuse jurors who had "problems" with the death penalty. That objection would appear to be subsumed within the death qualification issue. Such jurors do not form a "cognizable group" under *State v. Gilmore,* 103 *N.J.* 508, 526 n. 3 (1986).

## III

### Trial errors claimed.

### A.

Did the charge on diminished capacity shift to defendant the responsibility of disproving the culpable mental state for murder?

■ In *State v. Breakiron,* 108 *N.J.* 591 (1987), we revisited the doctrine of diminished capacity that the Court had first reviewed in *State v. Ramseur, supra,* 106 *N.J.* at 267–70. In *Breakiron,* we upheld the constitutionality of the "diminished capacity" statute, *N.J.S.A.* 2C:4–2, to the extent that it imposes on a defendant the burden of proving the presence of a mental disease or defect that has the capacity of negating the culpable mental state that is an essential element of the offense charged. *Breakiron, supra,* 108 *N.J.* at 618. At the same time, we emphasized that the statute intends no more than it states—i.e., that the defendant need show only that the condition was *present,* not that it in fact negated the culpable mental state. To do otherwise would impermissibly shift to a defendant the burden of disproving an essential element of an offense. 108 *N.J.* at 610–11.

For purposes of this appeal defendant must abide by our ruling in that case (*i.e.,* that the State need not disprove the existence of the disease or defect); nonetheless, he argues that the trial court's charge "drew no distinction between the subsidiary [existence of the disease or defect] and * * * the ulti-

mate [did it deprive defendant of knowledge or purpose] fact[s] * * * and in effect it set up a mandatory rebuttable presumption of the culpable mental state." We think not and find no error in the charge.

Preliminarily, we note that the jury was presented with competent and reliable evidence on the existence of the mental disease or defect. Dr. Gerald Cooke, the clinical psychologist, and Dr. Robert Sadoff, the psychiatrist, both examined defendant and were effective and credible witnesses on his behalf. We surmise that any question the jury may have had about the tenor of these experts' testimony concerned the realities of the crime more than any mistaken burden of proof.

Dr. Cooke, for example, reviewed defendant's mental troubles, his years of treatment in youth-service agencies, his broken home, his alcoholic and abusive parents, his broken marriage, and the death of his child. He traced defendant's decline through alcoholism and increased drug dependency to his "deteriorat[ion] into a psychotic state marked by paranoid delusions." Thus, the psychologist lent credence to defendant's account that on the day of the crime, he had sought refuge in the basement of the apartment complex and then entered the victim's apartment because he had felt himself pursued by dogs and police. In his interviews with the psychologist, defendant claimed that because he had believed that Mrs. Berrisford was a police officer or that she might signal the police, he had drawn the blinds and then struck her to quiet her. When she fell unconscious, he had sought to revive her by putting her under the bathtub tap; after she was scalded, he had attempted to aid her by wrapping her in the sheet. Thus Dr. Cooke testified that in his opinion Zola "did not intend to kill her." From his own contact with defendant, Dr. Sadoff repeated a similar account of the incident. In this psychiatrist's opinion, Zola "could not have knowingly or purposely killed [the victim]."

The doctors' thesis was sorely tested by the evidence: though Zola claimed to have struck the fully-clothed victim to quiet her, there was no blood on her clothes; her purse was never recovered; and Zola had sought refuge in the apartment of a tenant whose complaint had contributed to his termination. Indeed, Dr. Cooke admitted that if a rape had occurred, "it would not be consistent with the state [of mind] we're talking about."

The court was fair in its review of the presentation of these proofs to the jury. It ruled inadmissible, because of potential prejudicial effect, the evidence of a prior sexual assault committed by the defendant. It presented the diminished capacity issue to the jury with a straightforward charge generally drawn from the Model Jury Charge. In instructing the jury that "in the absence of such evidence [of diminished capacity] you may infer that the defendant had no mental disease or defect which would negate * * * a [criminal] state of mind," the court expressed the structure of the diminished capacity statute that sanity, and not guilty knowledge or purpose, is presumed. *See Breakiron, supra,* 108 *N.J.* at 607.

The one aspect of the diminished capacity charge that troubles us, other than its positioning in relation to the manslaughter counts, is the presence of language stating that defendant's burden is to "prove by a preponderance of the evidence that he suffered from a mental disease or defect *which negates* the state of mind which are elements of the offense. That is purposely and knowingly." (emphasis added). This element of the charge suggests that the defendant bore the burden of proving that at the time of the offenses a mental disease or defect did in fact negate his mental state. Taken in isolation, this would be counter to *Breakiron.* Previously, the court had charged the jury that even if defendant proved that he suffered from a mental disease or defect, "that fact alone would not dispose of the [mental state] issues." In addition, the court had charged the jury, at the end of all the knowledge/purpose offenses (murder, aggravated sexual assault, kidnapping, bur-

glary and robbery) that it need not consider the diminished capacity defenses if it found defendant not guilty of such offenses, then adding that "[i]f you find that the State has proven beyond a reasonable doubt each of the elements of the offense and the defendant's participation in the offense, you must then consider the evidence as to the defendant's mental disease or defect." This too, by isolating the stages of the jury's deliberations, might be seen as suggesting, rather than an order of deliberation, a shift in the burden of proof.

But we believe that the balance of the charge fairly conveyed to the jury its function. In the paragraphs immediately succeeding the "which negates" sentence, the trial court reemphasized the State's never-changing burden of proof:

Keep in mind, however, that although the burden rests upon a defendant to establish the defense of mental disease or defect by a preponderance of the credible evidence, the burden of proving the defendant guilty of the offenses charged here beyond a reasonable doubt is always on the State. And that burden never shifts to the defendant.

And the court added the qualification that the condition to be found need only be one that *"would* negate the states of mind which are elements of murder and certain of the other offenses." (emphasis added).

We recognize the continuing debate on the best manner of conveying the diminished capacity defense to the jury. *See* 121 *N.J.L.J.* 453 (March 10, 1988). We believe that the jury's understanding of this offense would be advanced by the suggestion offered before us in the Public Defender's brief. He proposed that in order to meet the constitutional requirement, the court should instruct the jury in words similar to these:

The defendant must prove by a preponderance of the evidence that he suffers from a mental disease or defect. However, the prosecution must prove beyond a reasonable doubt that defendant's mental disease or defect did not negate the state of mind which is an element of the crime, that is, purposely or knowingly. In other words, the prosecution must prove beyond a reasonable doubt that defendant acted purposely or knowingly despite his mental disease.

Unlike the *Breakiron* defendant, who was denied *any* charge on diminished capacity, this defendant was given a balanced charge. We are satisfied that the only burden imposed on the

defendant was to show the presence of the mental disease or defect that "would" or could negate the states of mind for murder, rape, or the other crimes charged. The State's burden, to establish the defendant's guilt beyond a reasonable doubt, never shifted.

### B.

Did the placement of the diminished capacity charge confuse the jury and deprive the defendant of his right to have the jury consider the manslaughter offenses independently of that defense?

In addition to challenging the content of the diminished capacity charge, defendant contends that the position of the instruction resulted in the illogical placement of the lesser-included offenses of murder at the end of the entire list of offenses charged, rather than immediately following the murder charge. Defendant claims that this positioning and other language deprived him of the opportunity to have the jury consider his guilt of the manslaughter offenses, i.e., aggravated manslaughter and reckless manslaughter, independently of the diminished capacity defense.

For the purpose of this appeal, we shall concede, as defendant argues, that he was entitled to the manslaughter charges quite apart from the presence of diminished capacity. At the time of this trial, we had not yet decided *State v. Crisantos (Arriagas)*, 102 *N.J.* 265, 278 (1986) (requiring submission of lesser-included manslaughter counts only when there is a "rational basis" in the evidence). Hence, court and counsel approached the lesser-included offense issues on the basis of whether there was even a scintilla of evidence that would warrant their submission to the jury. Defendant argues that the possibility of a manslaughter charge was certainly established by his statement to Dr. Cooke that he intended only to quiet the victim and that her death was thus unintended.

The trial court seemed to agree that it was appropriate to charge the two forms of reckless manslaughter, but noted the difficulty in deciding where to place these instructions in the

charge. The parties agreed that the diminished capacity defense applied only to the knowledge/purpose crimes: murder, felony-murder, kidnapping, rape, robbery, and burglary. Hence, the court chose to charge those crimes first, then charged diminished capacity, and finally turned to the manslaughter offenses.

However, in instructing the jury on the manslaughter offenses, the court stated:

> If it is shown that the defendant suffered from a mental disease or defect such that he did not have the state of mind required by law to constitute murder, you must find him not guilty of murder and guilty of the crime of aggravated manslaughter or the lesser included offense of reckless manslaughter.
>
> I shall charge you upon those two crimes upon completion of this topic [i.e., diminished capacity].

At the end of the diminished capacity charge the court instructed:

> Now, ladies and gentlemen, should you find the defendant not guilty of murder and felony murder, because of the defense of mental disease or defect, as I have previously instructed you, then you should consider whether or not he is to be found guilty or not guilty of the crime of aggravated manslaughter. Even though it is not specifically set forth as a count in the Indictment[,] I instruct you that mental disease or defect does not excuse one from criminal liability or the commission of the crime of aggravated manslaughter. The Indictment alleges that the defendant unlawfully killed Barbara Berrisford on January 13, 1983 at 144 A. Wert Avenue, Hamilton Township. According to the applicable law, criminal homicide constitutes aggravated manslaughter when the attacker recklessly causes death under circumstances manifesting extreme indifference to human life. [The court then explained the elements of aggravated manslaughter.]
>
> * * * However, if you find the defendant not guilty of aggravated manslaughter, you must consider the lesser included offense of reckless manslaughter. As is the case with aggravated manslaughter, the defense of mental disorder or defect does not excuse one from criminal liability for the commission of the crime of reckless manslaughter. A person is guilty of manslaughter if he recklessly causes the death of another human being [The court then explained reckless manslaughter.]

The question posed is whether this portion of the charge deterred or prevented the jury from returning an available manslaughter verdict.

█ The suggested order of deliberation given to juries by courts, although an understandable exercise in jury manage-

ment, inevitably raises such questions. In this case we believe that the court intended to convey no more than the principle that the jury should not be required to enter verdicts on lesser-included offenses when they have found guilt of greater offenses. Recall that the court had earlier charged the jury that they need not consider diminished capacity in respect of murder if it found that without analyzing that defense it had already acquitted the defendant of murder. But if it *had* considered diminished capacity vis-a-vis the murder and had then acquitted the defendant of murder, it would next have had to consider the available verdicts of manslaughter. Did this mean that it could not otherwise consider the available manslaughter verdicts? We think not.

The verdict sheet contained in the appendix suggested the kind of process that the court had in mind. Count One required the jurors to consider the charge of murder. On this charge, the court instructed the jury that if it found the defendant guilty of murder, it should go no further; however, if it found the defendant not guilty of murder, it then had to consider the offense of felony murder. If it found the defendant guilty of felony murder, it was to go no further as far as Count One was concerned; however, if it found defendant not guilty of felony murder, then it had to consider the offense of aggravated manslaughter. If it found the defendant guilty of aggravated manslaughter, then it could go no further as far as Count One was concerned; however, if it found the defendant not guilty of aggravated manslaughter, then it had to consider the offense of reckless manslaughter.

This concept of sequential resolution of available verdicts poses its own internal problems. *See People v. Boettcher*, 69 *N.Y.*2d 174, 513 *N.Y.S.*2d 83, 505 *N.E.*2d 594 (1987) (juries should not be permitted to consider lesser included offenses until after they have unanimously found defendant not guilty of the greater crime). The premise is "that it is the duty of the jury not to reach compromise verdicts based on sympathy for the defendant or to appease holdouts, but to render a just

verdict by applying the facts to the law as it is charged."
*Boettcher, supra,* 69 *N.Y.*2d at 183, 513 *N.Y.S.*2d at 87, 505
*N.E.*2d at 597. But in advancing that premise care must be
taken to avoid the stratification of thought that would deter a
jury from returning the proper available verdict. We believe
that the court here was attempting to ensure such fairness in
the jury's deliberations. As noted, the State and defense dif-
fered over the relevancy and positioning of the manslaughter
charges. The State argued that defendant's diminished capaci-
ty defense was the only justification for these charges; the
defense contended that the manslaughter charges were appro-
priate because there was evidence that defendant had intended
only to silence the victim. We believe that the court clearly
intended to permit each of the views of manslaughter to be
considered by the jury. At the close of the charge conference
on this issue the defense argued:

> THE DEFENSE: There's no question there is sufficient evidence here [indepen-
> dent of diminished capacity] to charge aggravated manslaughter by any stretch
> of the imagination as much [as] to charge robbery in this case.
>
> THE COURT: I'm going to charge it.

Although it is probably preferable that the included offense
charges be given in the context of the principal charge, because
of the unusual circumstances of this case (unlike *Breakiron,*
diminished capacity was raised as a defense to all counts, not
just murder), and because we are convinced that the charge did
not have the capacity of producing an unjust result, we would
not reverse the conviction on this basis. We are satisfied that
the jury, given the forceful closing arguments of defense
counsel and the unrestricted choice among the homicide of-
fenses shown on the verdict sheet (see Appendix A), knew that
it was charged to enter a verdict of manslaughter if the
evidence supported such a conclusion. Defense counsel placed
this issue squarely before the jury:

> But keep in mind [the] knowing and purposeful elements, particularly as to
> murder. That it's the State's burden of proof beyond a reasonable doubt.
> Burden of proof beyond a reasonable doubt, any reasonable doubt. Any
> reasonable doubt must be resolved in Jim's favor. What other evidence, what

other scenario of events—excuse me, accounts for all the evidence in this case. When you get into that jury room on Count One [the murder count], you will have four choices under the murder Statute. I'm sorry, under the murder count. Only the first involves a knowing and purposeful murder. You also have the choice of felony murder. Judge Schroth will ably instruct you as to what that is, but basically it is a killing during the commission of some other offense like burglary. You will also have the choice of aggravated manslaughter and manslaughter. Judge Schroth again will again explain the difference to you. But basically they are unintentional killings which is just what Dr. Cooke and Sadoff said happened here. You know, you were very carefully selected for this case. The jury selection process took approximately three weeks. Everyone in this courtroom has faith in your fairness and your ability. Your ability to use your common sense, your intelligence and your life experiences. Use those to reach a just and proper verdict, particularly to Count One. No purposeful or knowing murder here. There was a manslaughter. An unintentional killing. When you consider fairly and impartially all that was seen there and all that was said here, you'll reach the just and proper verdict in this case.

The jury concluded that murder, not manslaughter, was the just and proper verdict. (In the penalty phase the jury found that defendant did not suffer from a mental disease or defect that could have "significantly impaired" his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to law, even were that defect not of a degree sufficient to consitute a defense to the crimes charged.) Defendant now objects that the court's charge did not directly relate the diminished capacity evidence to the reckless manslaughter counts. On the issue of potential prejudice, we note that there is one aspect of the charge that favors the defendant. The court gave the defendant the benefit of the so-called "partial responsibility" charge by instructing the jury that if it accepted the diminished capacity defense set forth by defendant, "[it] must find him not guilty of murder and guilty of the crime of aggravated manslaughter or the lesser included offense of reckless manslaughter." *See State v. Ramseur, supra,* 106 *N.J.* at 269–70 (diminished capacity does not automatically reduce murder to manslaughter). The defendant did not request a charge, nor was there evidence that defendant's mental condition would detract from the recklessness of his conduct. *See State v. Juinta,* 224 *N.J.Super.* 711 (App.Div.1988) (evidence of diminished capacity relevant to presence of states of

mind for manslaughter offenses). Here defendant invited a manslaughter verdict.

Finally, we are strengthened in our conclusion by the realization that had the jury, apart from any consideration of a mental disease or defect, doubted defendant's knowledge or purpose to kill, it could then have considered a verdict of felony murder. Even an unintentional homicide accompanied by any of the felonies found would have been a basis for that verdict. Hence, we would not reverse on this ground.

## C.

Was the defendant prejudiced by the State's expert testimony on the issues of the sexual assault charges?

Defendant raises three objections to the testimony of the State's expert on serology, or the identification of bodily fluids: (1) that the expert was allowed to support his opinion on the basis of data undisclosed prior to trial; (2) that these data were gathered informally and were scientifically unreliable; and (3) that the expert was wrongfully permitted to offer an opinion beyond his expertise on an ultimate issue of fact—the alleged sexual penetration of the victim.

As noted, the defendant was convicted of aggravated sexual assault. *N.J.S.A.* 2C:14-2a(6). The State found no evidence of injury to the organs of the victim and detected no semen in her genital or other cavities. Consequently, the State sought to prove sexual penetration of the victim by noting, in connection with all other circumstantial evidence (her unclothed body, bound and spread-eagled; the defendant's underwear found under her pillow) the apparent presence of saliva in her genital cavity. The defendant had been aware that analysis of a vaginal swab was to be offered in evidence to support the State's charge of aggravated sexual assault, an offense involving some form of sexual penetration: the State had introduced the same evidence before the grand jury. At trial, however, the defendant's main complaint was that he had been caught by

surprise when the State's serology expert, Andrew Nardelli, offered his own informal studies to buttress his opinion that the elevated level of the digestive enzyme amylase found in the vaginal sample indicated the presence of saliva.

Mr. Nardelli, principal forensic chemist with the State Police, had adapted for his forensic purposes a test originally designed for clinical measurement of amylase in bodily fluids: the major difference between the two applications is that the original test operates on a known and relatively large volume of the fluid, while the modification is used to analyze stains or other residues. Nardelli added to each sample a starch coupled with a dye; any amylase present would react with the starch, releasing the dye into solution. The amount of dye released, as indicated by the resulting color of the solution, was measured instrumentally, producing a numerical value that reflected the activity of the amylase present in the sample. The average salivary amylase level found by this procedure was 1.627; the amylase level of the sample taken from the victim's own mouth was 1.845.

Before trial Nardelli had reviewed the "approximately 1,644" samples of bodily fluids that he had previously analyzed for amylase activity, and had noted the origins of those whose amylase level was equal to or exceeded 1.685, the victim's vaginal amylase level. He found that saliva had been present in all samples containing such an elevated amylase level, with the possible exceptions of forty-nine samples whose origins were not revealed by his records. By contrast, the amylase level of vaginal fluid would not be expected to exceed 0.422, which average Nardelli had derived from an unspecified number of samples donated by his female co-workers.

Nardelli did admit on cross-examination that the elevated amylase level in this sample might possibly have been produced by the process of autolysis, i.e., by enzyme action on dead or decaying tissue. The defendant did not object to Nardelli's testimony that the amylase level measured in the vaginal sam-

ple taken from the victim indicated the presence of saliva. Nor did defendant accept the trial court's offer of an *Evidence Rule* 8 hearing outside the presence of the jury on the admissibility of the expert's amylase results or conclusions: during a sidebar after the State had attempted to elicit Nardelli's opinion on the significance of saliva in this environment, the court had asked whether either party desired such a hearing. Defendant objected instead to certain surrounding aspects of the scientific process that had led the expert to conclude that saliva was present in the sample.

1. *Was the defense wrongfully denied the opportunity to examine Nardelli's log book during discovery?*

After concluding his cross-examination of Nardelli, defendant complained that he had not been given notice or granted discovery of the expert's 1,644 amylase measurements. Many of these analyses had been performed on evidence from other criminal cases; the record is unclear on whether this total number of measurements includes analyses of samples provided by Nardelli's female co-workers. The prosecutor indicated that he himself had not been aware of the master log book in which the expert had recorded these amylase results. He argued that Nardelli might in good faith have interpreted the defense's discovery request for his laboratory notes and those of a co-worker as not including the master log book; recall that Nardelli had disclosed the results of testing the victim's swabs for fluids relating to this alleged crime. On the following day, defendant requested a mistrial or alternatively the striking of Nardelli's testimony concerning the amylase, on the basis that defendant had not been provided with all the backup material. The trial court denied both motions but offered defense counsel the opportunity to examine the log books further and to recall Nardelli.

We find that while these data preferably should have been disclosed in discovery proceedings, the serology expert's

reference to them on the seventh day of a fourteen-day guilt phase (four-day penalty phase) trial did not have the capacity to prejudice the defendant. Concededly, given the exigencies of trial scheduling it would have been difficult for the defense to examine the logs and to recall Nardelli, or to prepare its own expert witness with respect to these previously undisclosed data; but these courses of action were not foreclosed to the defense. Moreover, at oral argument the defense contended that the other amylase tests performed by the expert should not have been introduced at trial, because defense had not been given proper notice that these raw data would be offered to support the State's charges of sexual penetration of the victim. This argument is strained because the expert's grand jury testimony had clearly addressed this point; the defense was able to foresee the essential duplication at trial of this testimony and underlying prosecutorial strategy.

Defendant's expert agreed to the central question—that the measurement of a sample's amylase content was a valid test for the presence of saliva—and further acknowledged that the "significant" level of amylase that Nardelli had detected in the sample was "consistent" with the presence of saliva in the victim's genital cavity; finally, he concurred that ordinary levels of amylase in genital fluid were possibly "several thousand times" less than those found in saliva. However, the defense expert insisted that this evidence could not be taken as "proof to a reasonable scientific certainty" that saliva was present. This expert's challenge to the State's thesis was that Nardelli had not tested the sample taken from the victim for the presence of other characteristic components of saliva (i.e., thiocyanate and alkaline phosphatase) and therefore had not proven conclusively that saliva was present in the victim's sample.

Thus, the central forensic question was not the validity of Nardelli's amylase measurement, but the weight to be given to his suggestion, in the absence of corroborating tests for saliva, that the victim's vaginal cavity contained saliva. Here, since

defendant's discovery difficulty was peripheral to that main element of the scientific debate, and since defendant was given the opportunity (although belatedly) to examine these data and to question the State's expert, we would not reverse on the discovery issue.

2. *Were the amylase results unreliable per se or obtained in a manner insufficiently formal?*

We have had recent occasion to explore the criteria for determining reliability of a scientific measurement offered in evidence at a criminal trial. In *Romano v. Kimmelman,* 96 *N.J.* 66, 80 (1984), we noted that the breathalyzer test's general acceptance within the scientific community demonstrated its scientific reliability. We expressed specific concern for general acceptance of a scientific methodology when the results of that test, without any additional inference, establish the crime itself. For example, a breathalyzer device can determine, without further proof, a driver's sobriety or drunkenness; a radar gun detects, without the need for corroboration, a driver's speeding. By comparison, the amylase results at issue here established only that there was a reasonable inference that fluids consistent with saliva were found in the victim's vagina; these findings did not in themselves establish defendant's guilt or innocence of sexual assault.

We find a sufficiently reliable basis for the court to have permitted the State's serologist to testify that the amylase level observed scientifically indicated the presence of saliva in the sample. The measurements in this case were derived by that expert's modification of a standard chemical test for the presence of amylase; the defense did not dispute the expert's qualifications, the efficacy of the test modification, or the validity of the results. It disputed the certainty of the modified test but not the principle on which it was based. It said not that the test was unreliable, but that a better one could have

been done. The basic amylase testing at issue here meets the *Romano* criteria for admissibility.

Defendant also objected to the "informality" of the expert's compilation of approximately 1,644 amylase samples supplied to him at the State Police forensic laboratory. In fact, the expert was unable to identify the sources of forty-nine of his highest amylase readings. However, nothing else in the record suggests that the readings obtained from the remaining samples were in any way unreliable. Many of the expert's samples were not, and indeed could not have been, provided to him simultaneously; instead, he added to his own responsibilities by not only analyzing the evidentiary materials from various cases as they came into his hands but by also requesting fluid samples from co-workers. The organization of his results in the master lab notebook, arranged by case, undoubtedly reflects the variety of other measurements that were being performed on samples in addition to the amylase testing. However, given the reliability of the test itself and the opportunity provided the defendant to examine the notebook to bolster his assertions of fatal "informality," we do not find the manner by which this expert gathered data to be so haphazard or careless as to render his results inadmissible. Nor do we find that this expert's impartiality is endangered by his possible interest in judicial acceptance of the analysis he developed (*cf. State v. Cary*, 49 *N.J.* 343, 352 (1967) (something more than bare opinion of one man, however qualified, required for acceptance of voiceprint identification technique)).

### 3. *Was the expert's opinion on possible salivary contact admissible?*

Defendant objected at trial to the State's line of questioning that led the expert to speculate on an ultimate fact, the source of the alleged saliva found in the victim's vaginal sample; the expert suggested that defendant had introduced his or the victim's saliva into that environment.

■ Initially, we recognize the limited role that expert testimony has in the trial of any case. Such testimony is required only to assist juries in determining that which they could not determine of their own ability: admissibility is predicated not on

whether the subject matter is common or uncommon or whether many persons or few have knowledge of the matter; but [on] whether the witnesses offered as experts have peculiar knowledge or experience not common to the world which renders their opinions founded on such knowledge or experience any aid to the court or jury in determining the questions at issue. [*Rempfer v. Deerfield Packing Corp.*, 4 *N.J.* 135, 141–42 (1950), *quoted in Butler v. Acme Markets, Inc.*, 89 *N.J.* 270, 283 (1982).]

■ The necessity for, or propriety of, the admission of expert testimony, and the competence of such testimony, are judgments within the discretion of the trial court. Obviously the expert's analysis of the vaginal swab and his conclusion that saliva was indicated to be present were admissible under *Evidence Rule* 56(2), which allows an expert witness to offer "such testimony [as] will assist the trier of fact to understand the evidence or determine a fact in issue"; the indications of saliva on the swab were relevant to a fact in issue, the condition of the victim. Subsequently the court prevented the State from asking its expert to "assume for a moment that the amylase found in Barbara Berrisford's vaginal swab was left there by Mr. Zola." However, the court then allowed the expert to answer the more general question, "can you account for the finding of amylase activity of this kind in a woman's vagina?" Here the State was preparing to rebut the defense's contentions that the sample did not contain the defendant's blood type and that the amylase detected could have been produced by autolysis, or decay of the victim's tissues. To meet that defense the court allowed the expert to aid the jury in determining what the scientific facts might indicate.

■ As the expert witness went on to testify, both the defendant and the victim were "secreters," whose blood grouping substances (Zola's type A; the victim's, type B) were also present in their other bodily fluids. Thus, if defendant's saliva

had entered the victim's genital cavity, normally marked by type B compounds, the analysis of the sample would also have been expected to contain defendant's type A compounds. However, only type B compounds were detected. At trial, over the objections of defense counsel, the court allowed the prosecutor to ask the State's expert why the vaginal sample, whose elevated amylase content indicated the presence of saliva, had been found to contain only the victim's blood compounds and not the defendant's blood compounds. In a response substantially similar to his testimony before the grand jury, Nardelli suggested that in the course of sexual contacts the defendant might have transferred the victim's own saliva to her vagina; even a small amount of the saliva could have made a large contribution to the observed amylase levels. Alternatively, defendant could have introduced his own saliva but its identifying components might have been masked out by the victim's blood group substances normally present in that environment. (Or, as the expert testified before the grand jury only, the victim's bodily processes after the possible introduction of Zola's saliva substances might have diluted them so much that analysis of the sample would have detected the increased amylase due to Zola's saliva but would not have revealed Zola's blood typing compounds from his saliva.) Finally, Nardelli noted that the sample might not have contained the defendant's blood group substance at all.

We are especially concerned about the use of expert testimony "to interpret matters that could be considered commonplace or conduct that could be accounted for commonsensically." A. Handler, "The Judicial Pursuit of Knowledge," Part I, 121 *N.J.L.J.* 882, 883 (May 5, 1988). We have no sense that this expert's suggestions were counterintuitive. Indeed, here it is hardly debatable that the subject of the saliva's source posed no matter of scientific complexity. However, we believe that just as the serology expert shed light for the jury on the arcane subjects of amylase levels and blood type detected in the sample, so too did he offer an opinion, rationally based on the

relationship of the scientific to the circumstantial evidence in this case, on a scientifically possible source of that material. Indeed, while the expert offered no scientific tests to support his hypotheses of the saliva's origin, he had previously testified that his records revealed that "samples taken from cases where the case report indicated that there was some type of oral sex involved" had produced amylase levels comparable to that observed in the victim's vaginal sample. Moreover, by his suggestions that on their face reinforced the commonsensical explanations for the saliva's origin the expert testified by omission that there was not a more esoteric explanation for his scientific findings. In this regard the expert assisted the jury's understanding that there was not necessarily an answer other than those that their own common sense suggested.

In admitting into evidence that common-sense interpretation of the relationship between scientific fact and the inference it sustained, the trial court's ruling did not infringe on the jury's capacity to determine an ultimate fact: the source of the saliva in the sample.

## D.

Was the defendant prejudiced by a discovery violation when one of the State's medical experts did not disclose prior to trial her change in opinion on the cause of death?

At the probable cause hearing, Dr. Raafat Ahmad, the County Medical Examiner who had issued the death certificate and had performed the autopsy, testified that the cause of death was "asphyxia and assault" but that she did not know "the precise mechanism by which the asphyxia was caused." She further stated at the hearing that "at this moment we do not know whether the nose was blocked or the mouth was blocked or both were blocked."

However, at trial Dr. Ahmad testified that the means of asphyxia was "manual strangulation," that is, by a hand or hands "obstructing" the victim's air supply at her neck. In support of her conclusion, the medical examiner cited an abra-

sion on the left side of the victim's neck, a contusion underneath her larynx, and extensive petechial hemorrhages in her face, eyes, neck, and lungs. These small dots of blood indicate a loss of oxygen caused by the stricture. When asked why she had not specified manual strangulation in her original report, Dr. Ahmad stated:

At the time it was still under investigation, the investigation was not complete. I hadn't studied, you know, the photographs, and I came to know later on after studying the case that this is the mechanism that led to the asphyxia, by all these, you know, findings that I have after studying the case.

Dr. Ahmad stated that she had informed the prosecutor at least twice before trial about her conclusion that Berrisford had been a victim of manual strangulation. But when defense counsel had telephoned the medical examiner approximately five weeks before trial, she had not stated her conclusion that the asphyxia was caused by manual strangulation because, in her words, "[They] didn't ask * * *. I gave what I thought was necessary at the time * * *."

Defendant contends that his rights to discovery under *Rule* 3:13–3(f) and to due process of law were violated by the medical examiner's testimony at trial that Barbara Berrisford's death had resulted from manual strangulation. The examiner's original conclusion was, in the defendant's view, consistent with his own account of the incident: that the victim was killed when, in a panic during a psychotic episode, he covered her mouth and nose to stop her from screaming. Defense counsel argued that the medical examiner's expanded conclusion about the means of asphyxia had surprised and prejudiced the defense.

The trial court rejected defendant's objection, reasoning that because Dr. Ahmad had originally listed assault as well as asphyxia as the cause of death, defense counsel could have questioned her in more detail because "maybe the assault is to the neck and to the other parts of the body, [and], maybe that includes strangulation." The trial court also noted that the defense had the opportunity before trial to review Dr. Ahmad's autopsy report as well as her diagrams and pictures of the

victim. Moreover, because another of the State's experts, Dr. Robert Goode, had concluded before trial that "manual strangulation" was the means of axphyxia, defendant had been "on notice" that proof of strangulation was going to be offered at trial. In fact, when informed by Dr. Goode during a pretrial conference that he would be testifying that the manner of death was manual strangulation, the State sent a letter to defendant notifying him of Dr. Goode's conclusion. For these reasons the trial court also denied defendant's post-trial motion for a new trial. Defendant argues before us that had he known before trial that the State had a definite theory about the cause of death, he would have consulted his own experts to contradict the State's argument.

By enabling each party to be informed of the other's case, our rules of discovery ensure fairness and avoid unfair surprise. *State v. Carter*, 91 *N.J.* 86, 110–11 (1982), discusses the rule established in *Brady v. Maryland*, 373 *U.S.* 83, 87, 83 *S.Ct.* 1194, 1196, 10 *L.Ed.*2d 215, 218 (1963), which sets parameters of fair conduct for nondisclosure of evidence favorable to the accused. The alleged discovery violations in this case do not amount to a suppression of evidence favorable to an accused, but rather represent an allegedly unfair trial tactic of withholding discovery of inculpatory evidence.

While we would agree that under *Rule* 3:13–3(f) the State could not ignore its continuing duty to disclose because the expert's amended conclusion was oral rather than written, we are satisfied that the State did not intentionally conceal information from defendant and that Dr. Ahmad's trial testimony did not unfairly surprise or prejudice the defense. It is unclear when the prosecutors learned that the cause of death was manual strangulation: Dr. Ahmad testified that she informed the State a year before trial; the prosecutor denied that but does not recall the specific date that this information was received. In any event, our conclusion is supported by the fact that the defense was aware before trial that the State would

rely on Dr. Goode's testimony to establish that manual strangulation was the cause of death. The trial court relied as well on the fact that the defense knew that Dr. Goode had been brought into the case and was thereby alerted to a possibly divergent opinion. It was thus almost inevitable that the State would have asked Dr. Ahmad if she concurred in Dr. Goode's manual strangulation conclusion. Moreover, the prosecutor was unaware that Dr. Ahmad had not informed the defense during a pretrial conference of her "manual strangulation" conclusion.

In this case, the State supplied defendant with Dr. Ahmad's autopsy report, diagrams, and photographs. Defendant could have sought before trial to question the medical examiner in more detail regarding her findings and to solicit opinions from his own experts regarding the cause of death. Dr. Ahmad's trial testimony was not inconsistent with her original report, but rather made specific what she had originally left general. Moreover, Ahmad's failure to clarify her position enabled the defense to make the point on cross-examination that this theory of strangulation was a trumped-up theory not discernible on the initial autopsy. Hence, we are satisfied that the discovery provided to defendant sufficiently advised him of the possibility of Dr. Ahmad's anticipated testimony. *See State v. Phillips*, 166 *N.J.Super.* 153, 157–58 (App.Div.1979), *certif. denied*, 85 *N.J.* 93 (1980). While we would not countenance the deliberate concealment of discovery by prosecutors, the trial tactic complained of did not constitute egregious prosecutorial misconduct amounting to a breach of the rules of fair play. *State v. Laganella*, 144 *N.J.Super.* 268, 282 (App.Div.1976).

### E.

Was the defendant prejudiced by the exclusion of the testimony of the psychiatric social worker on the defense of diminished capacity?

In support of his mental defense at the guilt phase of the trial, defendant offered the testimony of Diana Aviv, a

psychiatric social worker who had interviewed him on fourteen occasions prior to trial for a total of approximately twenty-five hours.

Aviv had completed undergraduate and graduate studies in social work, graduating from the University of Witwatersrand, South Africa and obtaining a masters degree from Columbia University. At the time of the trial, Ms. Aviv was director of the National Council of Jewish Women of New York and was engaged part-time in a private practice specializing in "marital and family therapy." Previously, she had served as the clinical director of a domestic violence clinic in Bergen County where she "was responsible for the clinical assessment, diagnosis and review of all cases [approximately 1,000] that came to the agency as well as the treatment plans of every single case."

Aviv is nationally certified and is licensed in New York; she serves on a number of advisory boards and belongs to a number of professional associations. She has presented a number of professional papers on the topics of violence, alcohol, and child abuse. Aviv has also trained social workers, psychiatric interns, police officers, and secondary and college students. She had previously testified as an expert in two New Jersey cases involving domestic violence: in a child abuse trial, she was not asked to diagnose that defendant's mental condition or to express an opinion on that defendant's intent; her testimony in a prior murder case concerned the question of whether the defendant suffered from battered women's syndrome.

A *Rule* 8 hearing was held to determine whether Aviv was qualified to give a diagnostic evaluation of defendant's mental state at the time of the murder. Aviv testified that psychiatric social workers are qualified to make "assessments" of an individual's present and past emotional health because they are trained to understand how personal and environmental factors shape behavior. She also distinguished psychiatric social workers from other mental health professionals: psychiatrists' specialty lies in their examination of the "biomedical and pharma-

cological factors" causing mental disease, while psychologists are specially qualified to administer psychological tests to analyze mental health. Defendant argued that Aviv was qualified under *Evid.R.* 56 to give a diagnostic evaluation of defendant's mental state at the time of the murder and that the State was free to cross-examine her on any perceived weaknesses in her "credibility." The State countered that the role of the psychiatric social worker is not so much as diagnostician but as one who administers care to the mentally ill.

After hearing arguments, the trial court ruled that Aviv was not qualified to testify as an expert during the guilt phase of the trial. The court reasoned that in light of other expert testimony produced by defendant, Aviv's testimony would have confused rather than assisted the jury.

Defendant argues that the preclusion of Aviv's testimony impeded the search for truth, thereby violating his constitutional rights to compulsory process and to present a defense. Citing *State v. Briley*, 53 *N.J.* 498, 506 (1969), and *Evid.R.* 7, defendant contends that the exclusion of Aviv's testimony at the guilt phase violated the presumption that an expert's "competency should be regarded as the rule and incompetency as the exception." (*Evid.R.* 7 deals, however, with general abolition of disqualification privileges and exclusionary rules, and not the qualifications of expert witnesses.)

Expert testimony is admissible under *Evid.R.* 56(2) "if such testimony will assist the trier of fact to understand the evidence or determine a fact in issue." If expert testimony is otherwise competent under *Evid.R.* 56, the fact that it may embrace the ultimate issue does not render it incompetent. *Evid.R.* 56(3).

In *State v. Kelly*, 97 *N.J.* 178, 208 (1984), we held that *Evid.R.* 56(2) "imposes three basic requirements for the admission of expert testimony: (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3)

the witness must have sufficient expertise to offer the intended testimony."

No reported New Jersey cases discuss the competence of psychiatric social workers as expert witnesses, and only two decisions mention the testimony of psychiatric social workers without questioning it. *See Beck v. Beck,* 86 *N.J.* 480, 492 (1981) (testimony at trial in joint custody case); *Fusco v. Fusco,* 186 *N.J.Super.* 321, 324 (App.Div.1982) (evaluation of five-year-old girl whose imprisoned father was seeking visitation rights). Defendant urges, however, that the "great weight of authorities in other jurisdictions favors admissibility." *See State v. McDonald,* 89 *Wash.*2d 256, 268, 571 *P.*2d 930, 936–37 (Wash. 1977) (psychiatric social worker permitted to testify to defendant's sanity where rules permit lay opinion on insanity and expert had clinical background and close contact with defendant).

Courts have also admitted the testimony of psychiatric social workers when that testimony remained within the experts' areas of specialization. *See In the Interest of C.W. and B.W.,* 342 *N.W.*2d 885, 887 (Iowa Ct.App.1983) (psychiatric social worker with six years experience in child psychiatry competent to testify in termination of parental rights setting). However, because psychiatric *diagnoses* are generally outside the competence of psychiatric social workers, appellate courts have sustained the discretion of trial courts that excluded such testimony. *State v. Baucom,* 28 *Or.App.* 757, 561 *P.*2d 641 (Or.Ct. App.1977); *see also Wilburn v. State,* 289 *Ark.* 224, 227, 711 *S.W.*2d 760, 761 (Ark.1986) (determination that social worker was not qualified to diagnose defendant's mental condition held not to be an abuse of discretion); *Wisehart v. State,* 484 *N.E.*2d 949, 954 (Ind.1985), *cert. denied,* 476 *U.S.* 1189, 106 *S.Ct.* 2929, 91 *L.Ed.*2d 556 (1986) (trial court in capital case did not abuse its discretion in sustaining prosecutor's objection to defense question asking treatment-diagnostics specialist "to diagnose the specific mental disease from which Defendant was suffering.").

In this case, the trial court applied the correct legal principles in evaluating the expert's competence to aid the jury. In its view, Dr. Aviv's special competence lay more in the treatment than the diagnosis of mental disease or defect. Our determination that defendant's right to present a defense was not unfairly circumscribed by the exclusion of Aviv's testimony during the guilt phase is bolstered by the fact that better-qualified mental health experts for the defense presented thorough and competent analyses of defendant's mental state at the time of the murder. We add a note of caution, however, that in capital cases trial courts must be especially mindful of the stakes involved. Had defendant been denied the defense of diminished capacity or precluded from introducing any expert testimony on his mental state at the time of the murder, the court's discretion to exclude such evidence would have been severely tested. However, such was not the case here.

## F.

### Other trial issues raised.

1. *Did the court incorrectly omit the jury charge on intoxication?*

Defendant challenges the trial court's refusal to charge the jury on the legal effect of voluntary intoxication. In this case the defendant's intoxication defense was predicated on the testimony of Dr. Cooke that defendant had been increasingly dependent on drugs and alcohol; on evidence that defendant had stolen and used a gram of methamphetamine on the day of the crime; and on the testimony of defendant's girlfriend that she knew that defendant frequently used methamphetamine and had often seen him using marijuana.

In *State v. Cameron*, 104 *N.J.* 42 (1986), we interpreted *N.J.S.A.* 2C:2–8, the intoxication defense under the Code, to be consistent with prior law. "Thus, when the requisite culpability for a crime is that the person act 'purposely' or 'knowingly,' evidence of voluntary intoxication is admissible to disprove that

requisite mental state." *Cameron, supra,* 104 *N.J.* at 53. Under the statute, intoxication may be attributed to drugs or to alcohol, *N.J.S.A.* 2C:2–8e(1), but must cause "prostration of faculties," 104 *N.J.* at 54, to be considered relevant to negating an element of the offense. We held that unless the evidence met that standard, the issue should not be presented to the jury. 104 *N.J.* at 54–57. To avoid any judicial "weighing of the evidence" in a criminal trial, we employed the familiar standard that only in those rare cases in which, after

"viewing the evidence and the legitimate inferences to be drawn therefrom in the light most favorable to defendant, * * * there is no suggestion in the evidence that defendant's faculties were so [affected] * * * as to render [defendant] incapable of purposeful or knowing conduct," should the trial court deny defendant's request. [*State v. Breakiron, supra,* 108 *N.J.* at 617 (quoting *State v. Cameron, supra,* 104 *N.J.* at 57 (citation omitted).]

We are satisfied that this is such a case. In its charge conference, the trial court carefully reviewed the evidence to determine whether there was any competent, reliable evidence that at the time of the crime defendant's faculties were prostrated due to intoxication. Indeed, it found no reliable evidence of ingestion of drugs or alcohol, much less any incapacitation of judgment due to use such substances.

The trial court noted in its charge conference that it had previously prepared an intoxication charge for use in the case. (Recall that jurors had been questioned about their attitudes towards narcotics.) The court felt that

now that we are through [with] the case, I cannot to the best of my knowledge find any proof of intoxication. The only indication of it came from the testimony of the psychologist, Dr. Cooke, and psychiatrist, Dr. Sadoff. But as we all know and as was said in *State v. Lucas* [30 *N.J.* 37 (1959)] by the New Jersey Supreme Court statements made by the defendant to doctors are not hearsay because they're not offered as proof of the facts asserted but merely as circumstantial indications of the state of mind of the accused as a foundation for the doctor's findings.

Even were we to find that *Lucas* means no more than that the doctor's recital of defendant's account must find independent corroboration in the record, if those facts are to be accepted, we find no evidence of prostration of faculties either in the experts' recitals or in the other accounts of the event. The only other

item of evidence alluded to is a statement from one witness that Zola had stolen a "gram of metha[m]phet[am]ine" from her on the morning of the crime. Moreover, the court found that the expert mental health witnesses did not state or imply that defendant was "intoxicated" on the murder date, but rather that he was a drug-dependent person who on this date had sunk into a delusional state. Finally, the woman with whom defendant lived did not testify to his being in an intoxicated state when he returned on the night of the crime, but stated only that defendant had been tired and had soon gone to sleep.

On this record, the trial court did not err in denying the intoxication instruction. The circumstances parallel those of a recent Appellate Division case:

> [D]efendant himself did not testify that he was intoxicated, and no expert testified to the probable effect of the liquor he had consumed.
>
> Witnesses who observed him a short time before [for Zola, after] the crime testified that he did not appear to be intoxicated and defendant's testimony showed a clear and detailed recollection as to the events of that evening. *See State v. Selby*, 183 *N.J.Super.* 273, 284 (App.Div.1981). [*State v. Micheliche*, 220 *N.J.Super.* 532, 543 (1987).]

On the question of whether the jury should have been given a separate instruction concerning the effect of intoxication on defendant's diminished capacity defense, we are satisfied that the jury had been presented with, and instructed to consider, all of the above evidence. As noted, Dr. Cooke had traced defendant's deteriorating life-style and his attempts to compensate for his emotional maladjustments by an increasing use of drugs and alcohol. The doctor believed that these dependencies in turn caused defendant's eventual "decompensation," from a personality already unstable, to the point of psychosis. The question of defendant's mental state at the time of the murder was for the jury to decide.

2. *Did comments made by the prosecutor deprive defendant of his right to a fair trial?*

Defendant contends that his right to a fair trial was violated by various comments made by the prosecutor during the pro-

ceeding. Specifically, defendant asserts that statements made by the prosecutor during his opening and summation shifted the burden of proof to the defendant, violated his fifth amendment right against self-incrimination by highlighting defendant's failure to take the stand, and inflamed and prejudiced the jury.

In *State v. Ramseur, supra*, 106 *N.J.* at 320, we noted that prosecutors occupy a unique position in the criminal justice system and that their primary duty is not to obtain convictions but to see that justice is done. *State v. Farrell*, 61 *N.J.* 99, 104 (1972). Although generally limited to commenting on the evidence and to drawing any reasonable inferences supported by the proofs, a prosecutor may nonetheless make "a vigorous and forceful presentation of the State's case." *State v. Bucanis*, 26 *N.J.* 45, 57 *cert. denied*, 357 *U.S.* 910, 78 *S.Ct.* 1157, 2 *L.Ed.*2d 1160 (1958).

We also stated in *Ramseur, supra*, 106 *N.J.* at 322, that prosecutorial misconduct is not grounds for reversal of a criminal conviction unless the conduct was such that it deprived defendant of a fair trial. Factors to be considered in analyzing prosecutorial conduct include: whether defense counsel made a timely and proper objection, whether the remark was withdrawn promptly, and whether the court gave the jury a curative instruction. 106 *N.J.* at 323.

We believe that the prosecutor's statement that the victim had been "tied spread eagle on her own bed" and subjected to sexual indignities did not deprive defendant of a fair trial. The remarks were well within the scope of the evidence before the jury.

Nor does our reading of the record disclose that defendant's fifth amendment right against self-incrimination was violated by the State's opening comments explaining defendant's connections to the crime scene. After describing the forensic proof that the State intended to offer, the prosecutor stated

that in our search for how defendant entered the victim's apartment, "[s]cience fails to be of assistance here, and only James Zola and Barbara Berrisford know for sure." Defense counsel did not make an objection to the comment when made and his motion for a mistrial after the State's opening was denied. We believe that the prosecutor's statement was a non-invidious reference to the circumstantial nature of the evidence and that the trial court was in the best position to assess any possible prejudice to the defendant. The trial court should be careful to discourage such remarks where it is clear that the defendant will not testify.

Defendant argues that the prosecutor's closing remarks that "the primary basis for knowing what Zola did or didn't do at Barbara Berrisford's apartment [and his life history] were the self-serving statements of James Zola" impermissibly shifted the burden of proof to the defendant or drew attention to his failure to take the stand. We note that these comments were intended to address not so much the failure of the defendant to testify as the incompleteness of the experts' analyses of all the evidence in the trial. Zola did not have to take the stand to address the questions that conflicted with the mental health experts' version of the facts. These items of proof could have been furnished by the defense team before the witnesses testified. Defendant's objection to this statement was not raised below. Under the plain error standard, we find that these remarks of the prosecutor were not clearly capable of producing an unjust result.

Finally, we are satisfied that the prosecutor's references to defendant's lack of employment at the time of the offense were not intended to be impermissibly suggestive of indigency as a motive for crime. *See State v. Mathis,* 47 *N.J.* 455, 471 (1966) ("Undoubtedly a lack of money is logically connected with a crime involving financial gain. The trouble is that it would prove too much against too many."). Rather, we think that the statement was intended to emphasize the fact that defendant

had worked at the Wingate Apartments previously and that he had no fixed work schedule at the time of the crime. "[T]here [was] something more than poverty to tie" defendant to the crime. 47 *N.J.* at 472.

In *State v. Ramseur, supra,* 106 *N.J.* at 323–24, we cautioned prosecutors in capital cases to be particularly sensitive to assuring that defendants are treated fairly and that justice is done. Although in this case we are satisfied that the alleged misconduct did not deprive defendant of a fair trial, we note again the special responsibilities of court and counsel in cases whose potential verdicts admit of no correction.

3. *Did the trial court wrongfully fail to permit allocution by defendant before the jury imposed the sentence of death?*

Defendant contends that he was denied a fair sentencing hearing because the court refused him the opportunity to make a statement to the jury without waiving his right not to be a witness against himself. He invokes the common-law right of allocution, the ancient right of a defendant "to present to the [sentencer] his plea in mitigation." *Green v. United States,* 365 *U.S.* 301, 304, 81 *S.Ct.* 653, 655, 5 *L.Ed.*2d 670, 673 (1961) (Frankfurter, J., plurality opinion). "The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." *Ibid.*

This common law right is codified in our Rules of Court by *Rule* 3:21–4(b), which provides: "Before imposing sentence the court shall address the defendant personally and ask him if he wishes to make a statement in his own behalf and to present any information in mitigation of punishment. The defendant may answer personally or by his attorney." A separate Rule of Court, *Rule* 3:21–4A, prescribes the procedure in capital murder cases. That *Rule* makes no specific reference to a capital defendant's statement in mitigation of punishment; it seems to have been assumed that such statements were not permitted.

In this case, defendant's attorneys elected not to present the defendant as a witness, where he would have been subject to cross-examination, during either the guilt phase or the penalty phase of the trial. Defendant contends that denial of his opportunity to make an unsworn personal statement to the jury is unconstitutional.

In *McGautha v. California*, 402 *U.S.* 183, 91 *S.Ct.* 1454, 28 *L.Ed.*2d 711 (1971), *vacated on other grounds*, 408 *U.S.* 941, 92 *S.Ct.* 2873, 33 *L.Ed.*2d 765 (1972) (deciding as well an Ohio case), the Court held that in an Ohio single-verdict capital trial it was not constitutionally impermissible to require that a defendant choose between testifying, subject to cross-examination, during the trial of his guilt or having a "death verdict returned by a jury which never heard the sound of his voice." 402 *U.S.* at 220, 91 *S.Ct.* at 1474, 28 *L.Ed.*2d at 733. In that single-verdict capital trial system, a jury finding a defendant guilty was to simultaneously decide whether they would recommend that defendant for mercy. The Court noted that petitioner was not "seeking vindication for his interest in making a personal plea for mercy." *Id.* at 219, 91 *S.Ct.* at 1473, 28 *L.Ed.*2d at 733 (footnote omitted). Even were that so, the Court noted that the right of allocution was not in itself a constitutional right; that its purposes could be satisfied by the arguments of counsel; and that, in any event, Ohio permitted allocution before the judge actually entered the capital sentence. The dissenting members of the Court saw that form of allocution as merely vestigial: since the jury's verdict had fixed the sentence of death, the defendant's speech before a judge would be but a hollow ritual.

The question for us is not what the Constitution commands, but what our civilization commends. Under our system of capital punishment, a jury of men and women forms the essential link between society and the defendant before the court. Each capital jury expresses the collective voice of society in making the individualized determination that a defendant shall live or die. Whatever the Constitution permits, it bespeaks our

common humanity that a defendant not be sentenced to death by a jury "which never heard the sound of his voice." *McGautha, supra,* 402 *U.S.* at 220, 91 *S.Ct.* at 1474, 28 *L.Ed.*2d at 733.

The State is wisely concerned that defendant not be permitted to lie with impunity to a jury that is attempting to reach a rational fact-based conclusion on whether he shall live or die. The defendant recognizes this concern and seeks no more than the right to stand before the jury and ask in his own voice that he be spared. He would not be permitted to rebut any facts in evidence, to deny his guilt, or indeed, to voice an expression of remorse that contradicts evidentiary facts. Similar procedures have been adopted in other jurisdictions. Washington apparently permits a capital defendant personally to "make an unsworn statement to the jury prior to closing arguments." *See State v. Mak,* 105 *Wash.*2d 692, 729, 718 *P.*2d 407, 430 (Wash. 1986). Maryland now permits allocution by a defendant before capital sentencing. *Booth v. Maryland,* 306 *Md.* 172, 507 *A.*2d 1098, 1109–18 (Md.1986), *vacated in part on other grounds and remanded,* —— *U.S.* ——, 107 *S.Ct.* 2529, 96 *L.Ed.*2d 440 (1987). The Maryland procedure would permit more than we contemplate in that it seemingly would allow the defendant to deny the killing. That would be more than a plea for mercy and should expose the defendant to impeachment. *See State v. Bontempo,* 170 *N.J.Super.* 220, 244 (App.Div.1979) ("Where, as here, a defendant's unsworn statements take on a 'testimonial' color, the jury might well be misled. Thus, a defendant who 'undertakes to answer part of the evidence against him [in a testimonial manner] is subject to comment as to factual thrusts he does not meet.' ") (quoting *State v. Fioravanti,* 46 *N.J.* 109, 117 (1965)).

The procedure we contemplate would allow the jury to hear from the defendant's voice that he is "an individual capable of feeling and expressing remorse and of demonstrating some measure of hope for the future * * *." Sullivan, "The Capital Defendant's Right to Make a Personal Plea for Mercy: Common Law Allocution and Constitutional Mitigation," 15 *N.M.L.*

*Rev.* 41, 41 (1985). Should the defendant stray from that plea either to dispute facts in issue or to offer other facts to exculpate himself,

> [t]hese types of facts are subject to rebuttal and form the basis for disputed issues which the trier of facts must resolve and, therefore, justify impeachment.
>
> In contrast, the accused making a plea for mercy does not intend to advance or to dispute facts, but instead uses the plea to ask for lenience or understanding in the sentencer's decision. If the accused does not stray from this subject matter in his statement, the plea does not justify traditional impeachment. [*Id.* at 63.]

In many capital cases, defendants do take the stand to offer evidence in mitigation of their sentence. They thus necessarily expose themselves to cross-examination upon the issues of the trial. In *State v. Rose*, 112 *N.J.* 454 (1988), also to be decided this term, we will have to deal with the breadth of such cross-examination. In other cases, as here, a capital defendant may elect not to testify, either because he believes it unlikely that he will persuade jurors or because he might be examined about previously inadmissible evidence not forming a statutory aggravating factor.

It is difficult to sympathize with defendants who have caused so much suffering, but we need not discard our common humanity in the process of decision. In the face of the State's forceful pleas in favor of the death penalty, it is difficult as well to accept the argument that the briefest statement by the defendant would inject a fatal emotionalism into the jury's deliberations. We see little harm that would come from an examination of the process requested by the Public Defender in this case.

We do not base our argument on State or federal Constitutions and would not find the absence of the right grounds to reverse a capital trial conducted prior to this date. We make our ruling in the exercise of our supervisory jurisdiction over criminal trials in New Jersey. Hence, in the future, we shall permit the narrowly-defined right of a capital defendant to make a brief unsworn statement in mitigation to the jury at the close of the presentation of evidence in the penalty

phase. Before a defendant speaks, he shall be instructed by the court, outside of the presence of the jury, of the limited scope of the right; that his statement is subject to the court's supervision; and that should the statement go beyond the boundaries permitted he will be subject to corrective action by the court including either comment by the court or prosecutor or in some cases possible reopening of the case for cross-examination. We shall request the Committee on Capital Causes to suggest any necessary procedures to assist trial courts in this aspect of capital sentencing. It might be useful for a court to examine in advance of the defendant's speech a written outline of the proposed statement. At any rate, we shall stand ready to reconsider this ruling if experience dictates that allocution creates more problems than it solves.

### 4. *Did the trial court wrongfully fail to explain mitigating factors?*

Defendant contests the trial court's failure to explain the mitigating factors, set forth in *N.J.S.A.* 2C:11–3c(5), in understandable terms related to the evidence in the case. This issue was raised in *State v. Bey II*, 112 *N.J.* 123, 166 (1988). We there explained that "[t]he requirement that capital sentencing must not preclude consideration of relevant mitigating circumstances would be hollow without an explanation of how the evidence can mitigate the imposition of the death penalty." *Id.* at 169. We emphasize here, as we did there, that a court must do more than read the words of the capital punishment act when charging the jury on the mitigating factors indicated or implied by defendant's evidence. Since most jurors are untrained in statutory interpretation, instructions that merely recite verbatim the language of the Act are generally inadequate. *State v. Bey II, supra,* 112 *N.J.* at 170.

In fairness to the court, the trial in this case, as in *Bey II*, occurred before our opinion in *State v. Ramseur, supra,* 106 *N.J.* at 292–99, in which we discussed the adequacy of jury

instructions on particular mitigating factors. On remand, the trial court should conform its charge to the requirements of that opinion and of *Bey II, supra.*

### 5. *Did the court incorrectly instruct the jury on unanimity of findings for mitigating factors?*

Defendant contests the trial court's instructions requiring that the jury unanimously agree on the existence of any mitigating factors. This point was decided in *State v. Bey II, supra,* 112 *N.J.* at 152–162. We held there that "the logic of the Act indicates that the Legislature intended that jurors need not unanimously find the existence of a mitigating factor." 112 *N.J.* at 159. We explained that it would contravene the logic of the Act for a jury to agree "unanimously" on a sentence of death where even a sole dissenter believes there is at least one mitigating factor present not outweighed by the aggravating factors.

### 6. *Was the charge on aggravating factor c(4)c inadequate?*

In *State v. Ramseur, supra,* 106 *N.J.* at 197–211, Chief Justice Wilentz set forth the Court's understanding of the legislative meaning of this aggravating factor. In that case and in *State v. Biegenwald, supra,* 106 *N.J.* at 48–52, we confined the meaning of the "murder [that] was outrageously or wantonly vile, horrible or inhuman" to the second portion of the statutory provision, i.e., to murders that "involve[ ] torture, depravity of mind, or aggravated battery to the victim." *N.J.S. A.* 2C:11–3c(4)c. In *Ramseur* and *Biegenwald* this Court elaborated on the meaning of each of these subsidiary considerations. Since there must be a retrial of the penalty phase, we do not resolve the adequacy of the c(4)c charge in this case (which objection was not raised below). On remand the court shall charge in accordance with those decisions.

In his supplemental brief the defendant contended that there was insufficient evidence to consider certain elements of

factor c(4)(c). *See State v. Biegenwald, supra,* 106 *N.J.* at 50, 524 *A.*2d 130 (on retrial only "depravity of mind" element could be presented due to insufficient evidence of torture or aggravated battery). We disagree. The wounding and scalding of the victim here may indicate defendant's desire to make the victim suffer before he killed her, or, if these injuries were inflicted after the victim had died, they could constitute a mutilation of the corpse. *See State v. Ramseur, supra,* 106 *N.J.* at 211, 524 *A.*2d 188. On this record, although there was some evidence of a motive of revenge, a properly charged jury might have concluded that the murder served no purpose of the defendant other than the desire to kill. *State v. Biegenwald, supra,* 106 *N.J.* at 50–51, 524 *A.*2d 130. On the remand the trial court should not submit to the jury any c(4)(c) elements that do not find support in the record.

### 7. *Did the court wrongfully fail to charge the jury on the consequences of a non-unanimous verdict?*

This point was raised in *State v. Ramseur, supra,* 106 *N.J.* at 299–304, and *State v. Bey II, supra,* 112 *N.J.* at 177. In those cases we explained that the 1985 amendment to the Act, *N.J.S. A.* 2C:11-3f, requires that the jury "be informed that a failure to reach a unanimous verdict shall result in sentencing by the court pursuant to subsection b," i.e., to life imprisonment with a thirty-year period of parole ineligibility. The special verdict forms provided to the jury should indicate these consequences of the jury's inability to reach a unanimous decision.

In this case, prior to the trial court's charge at the penalty phase, the defendant requested that the jury be informed of the consequences of their failure to reach a unanimous verdict. The trial court denied defendant's request, analogizing the jury's penalty phase deliberations to those of a jury in an ordinary trial, which is not advised concerning the effect of a deadlock. As the trial court observed, a jury is not so advised except in situations when they specifically request this informa-

tion. Subsequent to the verdict in this case, the statute was amended to require that the jury be informed that a failure to reach a unanimous verdict shall result in a sentence of life imprisonment. On remand, the jury shall be charged in accordance with the statute.

### 8. *Were the non-capital sentences excessive?*

The trial court sentenced defendant on the non-capital offenses to a consecutive term of 80 years in prison with a 40–year parole bar. Those sentences were made consecutive to the sentence on murder. Defendant suggests that the court misapplied the Code's sentencing factors when it concluded that

[the jury] imposed the maximum sentence. I feel it is therefore incumbent upon myself in my opinion to do likewise.

I feel strongly that my sentence should be consistent with theirs. There's no reason and no justification for me imposing any other sentence than the maximum allowed by law.

If ever a case cried out for the maximum penalties allowed by law, this does.

The court thus imposed four consecutive sentences for the maximum terms possible, all consecutive to the death sentence. Specifically, the court sentenced defendant on Count II (burglary) to a term of 10 years, 5 without parole; on Count Three (aggravated sexual assault), to 20 years, 10 without parole; on Count Five (kidnapping), to 30 years, 15 without parole; and on Count Six (robbery), to 20 years, 10 without parole.

In *State v. Yarbough,* 100 *N.J.* 627 (1985), we set forth general guidelines for courts to fashion consecutive sentences for multiple offenses imposed on one sentencing occasion. We there recognized "that even within the general parameters that we have announced there are cases so extreme and so extraordinary that deviation from the guidelines may be called for." 100 *N.J.* at 647.

Obviously, if defendant is resentenced to death, this issue will become moot. Rather than resolve the question in this abstract context, we shall await the resentencing of defendant on the murder count. This issue will be preserved for

review in the context of the murder sentence imposed by that jury. It is sufficient to observe that the sentence of death for the murder count does not dictate the imposition of maximum consecutive sentences for all related offenses.

### 9. *Was the sentence of death disproportionate?*

At the time of his trial, defendant would have been automatically entitled to "proportionality review" under *N.J.S.A.* 2C:11–3e. *L.* 1982, *c.* 111, § 1 (effective August 6, 1982). Subsequently, the Legislature amended the statute to provide for proportionality review only when requested. *L.* 1985, *c.* 178, § 2 (effective June 10, 1985). Our disposition of this case makes it unnecessary to undertake such a review under either statutory scheme.

We note that defendant reserved the right to make a "statistical proportional argument" when data were compiled that would classify homicide sentences according to race and sex of victim and defendant, type of crime, and similar factors.

In addition, defendant contends that his severe emotional impairments make the death penalty disproportionately excessive in his case. This argument appears to call for the conventional form of sentence review "similar to [that for] 'excessiveness' claims raised in non-capital cases." *Ramseur, supra,* 106 *N.J.* at 324 n. 84. The brutalized victim of a broken home, abandoned, and, worse, abused by his family, he drifted in and out of state institutions, failed in marriage, and lost his own child. Defendant's brief asserts that "[e]ven in the end his mother failed him. At the penalty phase of his trial, with his life on the line, she could not face the ordeal of testifying and literally fled from the courthouse." The defense asks whether he can be said to have suffered enough.

Defendant is especially aggrieved by the jury's failure even to consider as a mitigating factor the evidence that he suffered from a mental disease or defect that impaired his ability "to appreciate the wrongfulness of his conduct or to conform his

conduct to the requirements of the law." *N.J.S.A.* 2C:11–3c(5)(d).

The jury's finding, in defendant's view, was unsupported by the evidence. In uncontradicted testimony, Dr. Cooke, a psychologist, and Dr. Sadoff, a psychiatrist, had diagnosed defendant's condition as a borderline personality disorder, complicated by drug and alcohol dependency, that "decompensated * * * into a psychotic state marked primarily by * * * paranoid pathology, paranoid delusions and hallucination * * * [that] actively distort[ed] reality."

Although the jury's finding on this mitigating factor was perhaps influenced by the requirement that its finding of any mitigating factor must be unanimous, juries are not bound to accept the testimony of expert witnesses. Still, it seems that defendant shares characteristic features of mental disturbance with many other death-sentenced in New Jersey. L. Bienen, N. Weiner, D. Denno, P. Allison, and D. Mills, "The Reimposition of Capital Punishment in New Jersey: The Role of Prosecutorial Discretion," 12–13 (Interim Report, Part I) (to be published in 41 *Rutgers L.Rev.* No. 1 (1988)). This troubling statistic would have to be weighed in the proportionality review that might follow a jury's resentencing defendant to death. The record before us contains insufficient information for us to resolve the question of whether in New Jersey the death sentence is disproportionally imposed on mentally-disturbed defendants.

10. *Should the jury have found specifically that death was the appropriate punishment?*

This point was decided in *State v. Ramseur, supra,* 106 *N.J.* at 316 n. 80. We there held that no incantation had to accompany the jury's sentence of death, provided that the court's instructions have imparted to the jury its obligation to make the normative judgment that death was the "fitting and appropriate punishment" for the offense before them. 106 *N.J.* at 316 n. 80. We reemphasized in *State v. Bey II, supra,* 112 *N.J.* at

162, 163, that "[j]urors are not mere fact finders, but the ultimate determiners of whether the defendant shall live or die." History amply demonstrates that the jury is the essential link between capital punishment and the standards of decency contained in the eighth amendment. *Spaziano v. Florida*, 468 *U.S.* 447, 469–70, 104 *S.Ct.* 3154, 3167, 82 *L.Ed.*2d 340, 359 (1984) (Stevens, J., concurring and dissenting). On remand, the retrial shall be guided by these principles.

11. *Must the jury weigh any mitigating circumstances that the State failed to disprove?*

The defendant contends that the jury must accept as a mitigating factor any statutory factor on which the defendant has offered competent proof and that the State has failed to disprove. The capital punishment act now provides that the defendant has no burden of proving any of the mitigating factors, but only must "produce[ ] evidence of the existence of any mitigating factors" set forth in *N.J.S.A.* 2C:11–3c(5). Defendant infers from this that the Legislature intended a capital jury to consider as a mitigating factor any factor for which the defense has presented evidence.

We are unable to agree. The jury's determination of whether matters in evidence constitute mitigating factors is the result of a qualitative judgment. An example may illustrate the point. In *State v. Bey II, supra*, 112 *N.J.* at 149, although defendant was of the youngest age that could be subjected to the death penalty, the jury failed to find his youth a mitigating factor. Obviously, a qualitative judgment was involved. In each case a jury must decide was the offered "extreme mental or emotional disturbance" factor, c(5)(a), one that merited consideration (as the jury did here); was the offered "mental disease or defect" factor, c(5)(d), one that warranted consideration? These and other mitigating factors such as c(5)(e), the "unusual and substantial duress" factor, must be analyzed qualitatively.

In this and in other aspects of the capital sentencing process, the statutory factors are to guide each jury in making the determination that death is or is not the fitting and appropriate punishment for an individual defendant.

## IV

### Summary and Conclusion

For completeness of the record and preservation for federal review, we note the points raised in defendant's brief that were decided in *Ramseur, supra,* and *Biegenwald, supra:* specifically, defendant's continuing challenge to the constitutionality of the death penalty in New Jersey, both on its face and as applied, and, in particular, factor c(4)c's alleged vagueness; the consideration of felony murder as both an aggravating factor and a lesser-included offense of murder; the death qualification of juries; and the order of opening and closing statements. We have considered whether any departure should be made from our prior rulings, and we have concluded that no departure is justified.

In this case, the State does not disagree that the weighing process employed in the penalty phase was inconsistent with our rulings in *State v. Biegenwald, supra,* 106 *N.J.* 13, and that the jury should be instructed that in order to impose the death penalty, it must find, beyond a reasonable doubt, that aggravating factors outweigh mitigating factors. Therefore, a retrial of the penalty phase is necessary.

We have resolved the guilt phase issues raised by defendant. With regard to the major issues, we are satisfied that defendant suffered no prejudice from the trial court's exclusion of the testimony of a psychiatric social worker, since both Dr. Cooke and Dr. Sadoff, psychologist and psychiatrist, testified on defendant's behalf on the issue of diminished capacity. We are also convinced that the testimony of Mr. Nardelli on the presence of the bodily substance that indicated a sexual assault was reliable and admissible. Finally, we have an abiding certainty

that the jury was not confused by the evidence or by the instructions on the mental state of defendant: the jury knew that its obligation was to determine whether the State had proven beyond a reasonable doubt that defendant had the requisite mental states, i.e., knowledge and purpose, and the jury was free to enter the appropriate verdict.

The conviction of murder is affirmed as are the other convictions. The sentence of death is reversed and the matter remanded to the Law Division for capital resentencing.

HANDLER, J., concurring in part and dissenting in part.

In this case the evidence that the defendant, James Zola, was guilty of the knowing and purposeful murder of Barbara Berrisford was extensive. I concur in the majority's determination that defendant's death sentence should be reversed, and that constitutional considerations aside, his conviction for knowing and purposeful murder should be upheld. I write separately, however, to state my disagreement with the Court's treatment of the expert testimony offered relating to the additional charge of aggravated sexual assault, and to offer some observations concerning the evidence of diminished capacity.

The evidence of aggravated sexual assault was a significant factor in the entire case not only because it supported a serious guilt phase charge, but because it also formed a basis for submitting aggravating factor c(4)(g) to the jury and thus for the imposition of the death penalty. This evidence was inconclusive at best and was buttressed by unreliable and inadmissible expert testimony. Therefore, I would find, contrary to the majority, that the aggravated sexual assault conviction should be reversed and that it cannot be used to support this aggravating factor at the re-sentencing hearing.

I acknowledge that the Court has determined a number of other important issues on this appeal, which do not require a

separate response. I emphasize, however, my continuing disagreement with the Court concerning the validity of the capital murder-death penalty statute based on constitutional grounds and principles of fundamental fairness and statutory interpretation. *See, e.g., State v. Ramseur,* 106 *N.J.* 123, 343 (1987) (Handler, J., dissenting). These differences cannot be set aside as long as capital-murder jurisprudence remains in flux. *See State v. Bey (II),* 112 *N.J.* 123, 189–90 (1988) (Handler, J., dissenting); *State v. Koedatich,* 112 *N.J.* 225, 383 (1988) (Handler, J., dissenting).

## I.

The review of this appeal as it pertains to the capital murder conviction should be governed by an enhanced standard of review. *See State v. Bey (I),* 112 *N.J.* 45, 106–20 (1988) (Handler, J., concurring). Under this enhanced standard, courts engage in a searching review of the trial record, and on finding error, use a different and stricter standard for determining whether an error is reversible. *Ibid.*

Unlike the conventional "plain error" or "harmless error" analysis, in which the trier of fact looks to whether the error contributed to the verdict or the result reached was unjust, the enhanced standard focuses attention on the jury's deliberations. The question in a capital murder appeal should be whether the State can prove beyond a reasonable doubt that there was no realistic likelihood that the error had a prejudicial influence or effect on the jury's deliberations of guilt. Because we are dealing with a capital crime, which more fundamentally addresses through the jury the conscience of the community, it is appropriate to invoke a test that is stricter than one that only asks whether an error contributed to a guilty verdict, or whether the error produced an "unjust result."

## II.

The majority has in detail recounted the grisly facts in this case. James Zola did not testify at his trial. His account of

events was relayed, instead, through the testimony of two experts, Dr. Gerald Cooke, a clinical psychologist, and Dr. Robert Sadoff, a psychiatrist. Both testified that the defendant was, in their opinion, incapable of forming a knowing or purposeful state of mind, and therefore could not be found guilty of knowing or purposeful murder. Both diagnoses relied heavily on Mr. Zola's account of what had occurred. The evidence offered on behalf of this diminished capacity defense was that defendant had a mental disease or defect, that he was suffering from a "paranoid psychosis."

The Court rejects defendant's challenge to the constitutionality, both facially and as applied, of *N.J.S.A.* 2C:4-2, the "diminished capacity" defense provision in the Criminal Code. As this affirmative defense has been explained in *State v. Breakiron*, 108 *N.J.* 591 (1987), I agree it is not unconstitutional on its face. I cannot agree, however, that the trial court's instructions to the jury with respect to its consideration of the evidence of defendant's mental defects were completely error-free.

As the majority observes, the trial court charged that the State must prove "beyond a reasonable doubt each of the elements of the offense and the defendant's participation in the offense" before the jury is obliged even to consider "the evidence as to the defendant's mental disease or defect" as a defense. *Ante* at 402. This particular instruction is consistent with our ruling in *Breakiron*. It did not improperly shift the burden of proof with respect to the charge of capital murder.

In connection with the charge of murder the court also instructed the jury that "to establish mental disease or defect as a defense ... the defendant must prove by a preponderance of the evidence that he suffered from a mental disease or defect which negates the state(s) of mind [purposely and knowingly] which are elements of the offenses." This instruction properly placed the burden of establishing diminished capacity

by a preponderance of the evidence on defendant, consistent with our ruling in *Breakiron.*

After instructing the jury on diminished capacity as an affirmative *defense* relating to the charge of murder, the trial court charged that if this defense were established, the jury must consider whether the defendant was guilty of aggravated manslaughter or reckless manslaughter. The trial court then instructed the jury with respect to aggravated and reckless manslaughter, stating within this section of the instructions that the evidence of mental disease or defect would not excuse one from criminal liability for such a reckless killing. The trial court did not instruct the jury that this evidence could support a finding of aggravated or reckless manslaughter.

The trial court's resultant charge was in error because it did not guide the jury on how it should consider and apply this evidence to the manslaughter offenses. Specifically, the court did not distinguish for the jury between how diminished capacity is used in considering the murder charge, *i.e.*, as an affirmative defense negating an element of the crime, and how it is used in considering manslaughter, *i.e.*, as evidence proving recklessness. The court thus did not clarify or explain the critical distinction between diminished capacity as an affirmative defense to murder and simply as evidence relevant to the manslaughter offense.

This error in the diminished capacity charge does not, however, require a reversal of defendant's murder conviction. The trial court noted correctly that apart from the evidence of diminished capacity, there was very little evidence to support a reckless killing. In fact, all of the evidence of this killing pointed strongly toward the State's contention that this was a knowing and purposeful murder. The trial court's failure to treat the evidence of diminished capacity as one of many pieces of evidence supporting a reckless killing instead of as an affirmative defense simply pales in force and effect, and hence in its influence on the jury's deliberations, because of the

pervasive evidence of a purposeful killing and because there was no other evidence of a reckless killing. Most important, the trial court's imperative statement that the jury must find that a killing was reckless if diminished capacity was established linked diminished capacity and reckless killing in a manner that impressed upon the jury the fact that evidence of diminished capacity could support a finding of aggravated or reckless manslaughter.

I submit, then, the trial court's charge with respect to the jury's consideration of the evidence of mental disease or defect was erroneous, but not reversible. Under a conventional standard, I believe that the court's mistaken treatment of diminished capacity did not contribute to the jury's determination of guilt. Moreover, under an enhanced standard of review, I am unable to conclude that there was a realistic likelihood that the court's instruction on diminished capacity prejudicially influenced the jury's deliberations. I would therefore not find this error reversible.

### III.

Defendant challenges the jury's finding of guilt on the aggravated sexual assault charge. He argues that the State's expert's testimony on the saliva found in the victim's vagina was improperly admitted and that this unfairly prejudiced the jury. I find that the admission of such evidence does not require a reversal of the murder conviction, but that it should require a reversal of the aggravated sexual assault conviction.

The aggravated sexual assault charge proved most difficult to establish. There was no evidence of trauma to the victim's sexual organs, and laboratory tests of the oral, anal, and vaginal swabs taken at the autopsy were negative for the presence of spermatozoa or seminal fluid. Nor were there traces of these substances found elsewhere. Rather, the State relied primarily on a laboratory finding that there were elevated levels of amylase activity in the victim's vagina. Through

its expert the State was able successfully to argue to the jury that this chemical finding was attributable to saliva that was present, and that the presence of the saliva was the result of a sexual act involving penetration.

These proofs were dependent on expert testimony that did not meet the standards for scientific reliability that this Court has required to admit such evidence. The majority, however, apparently believes that the evidence meets such standards, *ante* at 412, and that defendant's conviction for aggravated sexual assault is therefore untainted and should stand. I strongly disagree.

The presence of amylase in the victim's vagina, according to the State's expert chemist, Dr. Andrew Nardelli, was strongly indicative of the presence of saliva. Nardelli testified that amylase is an enzyme that breaks up starch material into smaller units. It is found in high concentrations in saliva and in the pancreas, and in lesser concentrations in semen, sweat, and tears. The gist of Nardelli's opinion was that the amylase activity from the victim's vagina was well in excess of the normal level. He acknowledged that such an elevated level of amylase activity could indicate "something going wrong within your body." But, he said, if such things are "taken care of," then the elevated amylase levels could come from "a common outside source, something that is easily transferred, and would be from something characteristic of saliva because it falls exactly within the range of saliva." [1]

---

[1]The chemist described the laboratory experiments he conducted as follows:

We have run approximately 1,644 samples for amylase activity. Because of this particular case, and the significance of what this means, I went through every one that we ran, and I looked at every sample that we recorded with a value of an amylase activity equivalent to or higher than this particular reading.

And I went through all of our files. I didn't know what the samples were, all. I just had a case number and specimen number, so I had to track back to them.

Defense counsel objected to the chemist's testimony based on this comparison of amylase levels. He pointed out that he had not had any of the witness's laboratory reports, logs, or notes sufficiently in advance of trial, and so could not adequately prepare for cross-examination. The trial court overruled the objection, noting that the State also did not have some of this information, and offered defendant an opportunity to review the data in question and recall Nardelli for cross-examination.

Defendant argues now that the State's failure to disclose through discovery the results of Dr. Nardelli's comparison of amylase levels was extremely prejudicial and that "a defense expert given the opportunity to review the informal study before trial could very likely have challenged its methodology and thus its reliability." In light of the absence of a foundation for Nardelli's study, I agree with defendant's contention that the lack of proper notice takes on additional significance.

More important, however, than the lack of adequate notice and proper discovery is the fact that Nardelli's "study" was itself of unproven reliability as scientific evidence. This Court has repeatedly insisted that scientific evidence satisfy minimal standards of reliability. *See, e.g., State v. Cavallo*, 88 *N.J.* 508 (1982); *State v. Hurd*, 86 *N.J.* 525 (1981). In *State v. Kelly*, 97 *N.J.* 178 (1984), Chief Justice Wilentz, for the Court, explained that Evidence Rule 56(2) "imposes three basic requirements for the admission of expert testimony: (1) the intended testimony

Everyone that I could find information for that particular sample, types of samples I was finding were known saliva samples, samples taken from flaps of envelopes, samples taken from cigarette butts, samples taken from cases where the case report indicted that there was some type of oral sex involved.

Of all these samples, and I must admit there were 49 I was not able to trace back because of inadequate case histories or the case was not present in our laboratory, but of all the ones that I found, everything came back to an indication of saliva. And from my experience in looking these up, and of the samples that we've examined, the only other easily available source of this activity from my experience, would be of that type of alpha amylase that would be present in saliva.

must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony." *Id.* at 208. Turning to the question of reliability, the Court noted that "[t]he technique or mode of analysis used by the expert must have a sufficient scientific basis to produce uniform and reasonably reliable results so as to contribute materially to the ascertainment of the truth." *Id.* at 210. This "sufficient scientific basis" can be established, "[i]n a relatively new field of research," by reliance on (1) "expert testimony as to the general acceptance" of the premises on which the expert's analysis is based, (2) "authoritative scientific and legal writings" indicating general acceptance of these premises within the scientific community, and (3) "judicial opinions [indicating] the expert's premises have gained general acceptance." *Id.* at 210.

These standards of reliability were not met in this case. There was no proof of the general scientific acceptance of the chemist's "technique" for determining and identifying amylase activity, *see Ferlise v. Eiler,* 202 *N.J.Super.* 330, 334–36 (App. Div.1985) (holding thermograph results inadmissible in part because there was no record below establishing reliability), and there were no other experts to attest to the reliability of the witness's results, *cf. State v. Kelly, supra,* 97 *N.J.* at 213–14, n. 19 (on remand trial court must allow State to present conflicting expert testimony concerning reliability of battered woman's syndrome). The only evidence to support Nardelli's belief that the methodology used was scientifically reliable was his own. This is insufficient, particularly when the expert is a proponent of his own theory and is so clearly identified with the particular subject matter. *See Windmere, Inc. v. International Ins. Co.,* 105 *N.J.* 373, 380–81 (1987) (testimony of two experts affiliated with development of voiceprint analysis, which the court noted appeared to be "a sole source industry," did not establish general acceptance within scientific community and was suspect

because of "potential bias." *People v. Brown,* 40 *Cal.*3d 512, 530, 230 *Cal.Rptr.* 834, 726 *P.*2d 516 (Cal.1985) (expert testifying to general acceptance of scientific technique must be "not so personally invested in establishing the technique's acceptance that he might not be objective"), vacated and remanded on other grounds *sub nom. California v. Brown,* 479 *U.S.* 538, 107 *S.Ct.* 837, 93 *L.Ed.*2d 934 (1987).

In my view, the trial court has an independent judicial responsibility to ascertain the competence of an expert's proffered opinion and to satisfy itself about the admissibility of such scientific evidence, absent an informed defense decision to accept its admissibility.

The State itself presented no other expert testimony or scientific writings or legal precedents showing that the procedures followed by its own expert for determining average amylase levels in saliva and vaginal secretions followed generally accepted or standard scientific practice. The Court misperceives the significance of this omitted foundation, stating that the expert's testimony that "fluids consistent with saliva were found in the victim's vagina ... did not in themselves establish defendant's guilt or innocence" of aggravated sexual assault. *Ante* at 412. However, Nardelli's testimony did not play a secondary role; rather it provided a central and indispensable basis for the State's case on the aggravated sexual assault charge because without this testimony there was no evidence of penetration.

The State argues that this testimony could be admitted under *Evidence Rule* 57, which provides that "[s]ubject to Rule 56, a witness may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The witness may in any event be required to disclose the underlying facts or data on cross-examination." The Rule, however, only addresses the discovery problem and in no way obviates scientific reliability as a condition to the admissibility of expert opinion testimony.

Moreover, the trial court's reasons for overruling the defendant's objection to this evidence on discovery grounds are not persuasive. The trial court's reliance on the alleged absence of bad faith on the prosecutor's part did not diminish the prejudice; it was the defendant, not the prosecutor, who suffered from this failure of discovery and lack of knowledge. Further, the remedy offered by the trial court in this case—allowing the defense in midtrial to review all of the chemist's records and recall the witness—was illusory. The methodology used by the chemist involved data from over 1,600 tests performed under seemingly uncontrolled and undescribed circumstances. The court's remedy thus required the defendant to assume the unreal burden of reviewing the results and relating them to the facts of the instant case. Defendant was placed at a terrible disadvantage, being forced to interrupt the trial and attempt to redress the failure of discovery or to go forward with the trial surprised and unprepared. Confronted with the trial court's rulings, defendant did produce his own expert, but that expert could only stress that the entire approach was flawed and unreliable and that tests should have been performed to locate other "identifying markers" of saliva.[2] It was error for the trial court to have tipped the adversarial balance so sharply against the defendant because of the State's unilateral, critical, and avoidable derelictions.

The failure of discovery and the use by Nardelli of an unreliable and non-scientific methodology as a basis for his expert opinion that saliva was present in the victim's vagina were exacerbated further by the fact that he was permitted to express his own opinion that the saliva was present because of sexual penetration.[3] The offer of this opinion was grave error.

---

[2]His opinion that the readings might be consistent with saliva amylase does not provide support for Nardelli's unreliable and unscientific methodology.

[3]This was the expert's so-called "scientific" opinion:

The testimony of any expert is permitted only to assist the trier of fact in understanding "a subject-matter beyond the understanding of persons of ordinary experience, intelligence, and knowledge." *State v. R.W.*, 104 *N.J.* 14, 30 (1986); *see, e.g., State v. Kelly, supra*, 97 *N.J.* 178; *Evers v. Dollinger*, 95 *N.J.* 399 (1984). As noted by the court in *DiNizio v. Burzynski*, 81 *N.J.Super.* 267, 272 (App.Div.1963) (quoting *Rempfer v. Deerfield Packing Corp.*, 4 *N.J.* 135, 141 (1950)),

> [t]he true test of admissibility of such testimony is not whether the subject matter is common or uncommon or whether many persons or few have knowledge of the matter; but it is whether the witnesses offered as experts have peculiar knowledge or experience not common to the world which renders their opinions founded on such knowledge or experience any aid to the court or jury in determining the questions at issue.

In this case there was no showing that the chemist had any special or peculiar knowledge or experience in the area of determining when sexual penetration has occurred. Nor in fact was it shown that this, the presence of saliva in the vagina leading to the conclusion that sexual penetration may have occurred, is something that the ordinary person could not determine from common experience, unlike other areas where a specialist might be needed in order to educate a factfinder about some related scientific question. *Cf. Holt v. State*, 147 *Ga.App.* 186, 248 *S.E.*2d 223 (1978) (in prosecution of rape, question calling for physician's opinion as to what caused tear in victim's vagina properly left itself to expert opinion and did not invade province of jury).

As a result of the lack of any showing that the chemist was an expert with respect to the sexual transmission of saliva, it was improper to permit him to express his own, personal opinion concerning sexual penetration. Because he was accepted by the court as an expert in other areas, and presented to

> Sexually, you can use saliva to be transferred as a lubricant. You can in sexual occurrence, which I have seen, where the penis is placed in the mouth of an individual, and then placed into the vagina of an individual, you have a direct transfer of amylase.

the jury as an expert, the jury was likely to attribute undue weight to his opinion that sexual penetration occurred. *See State v. R.W., supra,* 104 *N.J.* at 30 (recognition that a factfinder's "uncritical acceptance of expert testimony can becloud the issues."); *Biro v. Prudential Ins. Co. of America,* 57 *N.J.* 204 (1970), rev'g o.b. 110 *N.J.Super.* 391, 402–06 (App.Div.1970) (dissenting opinion) (improper to admit testimony by medical examiner, based on statements by decedent's relatives or friends, that death was result of suicide as this was not within expertise, and there was potential that jurors would place undue credence on it due to witness' status as expert); *see also* Biunno, *N.J. Rules of Evidence, Comment 8 to Evid.R. 56* (Anno.1988). As the Court noted in *In re Hyett,* 61 *N.J.* 518, 531 (1972),

[a]n expert witness should distinguish between what he knows as an expert and what he may believe as a layman. His role is to contribute the insight of his speciality. He is not an advocate; that is the role of counsel. Nor is he the ultimate trier of the facts; that is the role of the jury or the judge, as the case may be. The trier of the facts may be misled if the expert goes beyond what he can contribute as an expert.

In this case the expert went beyond the bounds of his expertise and thus improperly infringed on the factfinder's role.

Given the circumstantial nature of the evidence of aggravated sexual assault (the position and state of undress of the body, the underwear on the bed, the dentures on the nightstand), as well as of its non-occurrence (the *absence* of semen and of any kind of trauma to the victim's sexual organs that would indicate penetration), the chemist's testimony that saliva was found in the victim's vagina and that the saliva was present only as a result of sexual penetration became central to the State's attempt to prove this element of aggravated sexual assault. Admission of this testimony by Nardelli constitutes error because it was based on unreliable scientific methodology, was not properly disclosed, and improperly concerned an "ultimate fact" beyond the reach of expertise.

The prejudicial effect of this must also be conceded. This is confirmed in light of the prosecutor's guilt-phase summation.

In this he focused almost exclusively on the expert testimony, stating flatly that this showed that the amylase found in the victim was a result of Zola's sexual penetration of the victim.[4]

We do not have to speculate whether the expert's opinion was prejudicial. Its prejudiciality was graphically underscored by the prosecutor's concession that the evidence of sexual penetration would have been insufficient without the expert's opinion.[5]

The question remains, however, whether the erroneous admission of Nardelli's testimony constitutes reversible error with respect to the capital murder conviction. Because this is a capital case, the test, I submit, must be whether this evidence affected the jury's *deliberations,* not necessarily its *determinations,* in a way that prejudiced the defendant. *See State v. Bey (I), supra* 112 *N.J.* at 117–19 (Handler, J., concurring). The test is whether there is a realistic likelihood that

---

[4]This statement was:

Andy Nardelli told you, it would have gotten there either from oral sex, that is cunnilingus or it would have gotten there because the defendant lubricated either his penis, finger or an object with saliva and then inserted that penis, that finger or that object into her vagina.

And to counter the suggestion that there was no penetration because the saliva did not match that of the defendant, the prosecutor further stated:

Andy Nardelli gave you the explanation for that, too. He told you that if a defendant has fellatio with a woman and then inserted his penis into her vagina without ejaculating, you would find her amylase and not his.

[5]The prosecutor argued:

Was Barbara Berrisford sexually assaulted by James Zola. If all we had was evidence in this case with Barbara Berrisford nude on her bed, *that might not be enough.* If all we had was evidence in this case that Barbara Berrisford was tied spread eagle on her bed, *that might not be enough.* If all we had as evidence in this case was the defendant's underwear on her bed, *that might not be enough.* If all we had in evidence in this case was salivary amylase in Barbara Berrisford's vagina, *that alone might not be enough.* But when all of these conditions exist, the State submits that it is an inescapable conclusion that James Zola sexually assaulted Barbara Berrisford, *penetrating her vagina, whether he, whether he used his tongue, his finger, an object or his penis* while she lay helplessly tied to the bed. (Emphasis added).

the admission of this opinion evidence had a prejudicial effect on the jury's deliberations. *Ibid.*

Although the evidence should not have been admitted, it is impossible, I believe, to conclude that this admission created a realistic likelihood of having a prejudicial effect on the jury's deliberations with respect to the murder charge. The explosive and prejudicial nature of the evidence against the defendant that was properly admitted to support the other charges, particularly capital murder, minimized dramatically the prejudicial influence of Nardelli's testimony on the jury's deliberations. Such evidence included the fact that the victim, a seventy-five year old woman, was kept captive for a long time; that she was isolated, terrorized and subject to abuses and violence; that she was tied spread eagle to a bed, and severely scalded from hot water; and that she died from asphyxia resulting almost certainly from manual strangulation. This overwhelming evidence of brutal murder serves so demonstrably to stigmatize the defendant as a vicious homicidal character that the added evidence of a sexual attack would not significantly heighten this impression of wantonness. It is in this sense that such evidence would not have had a prejudicial effect on the jury's deliberations.

For these reasons I therefore would reverse defendant's conviction for aggravated sexual assault, but would not on these grounds find cause to reverse the murder conviction.

## IV.

In this capital murder case, I concur in the Court's reversal of defendant's death sentence. I can also concur generally in the reasoning of the Court that would affirm defendant's conviction for murder. I disagree with its holding that the conviction for aggravated sexual assault should be upheld and would bar such evidence from a future penalty phase proceeding unless guilt is established in a second trial. The errors that create special concern, those relating particularly to the crime

of aggravated sexual assault as well as the evidence of diminished capacity, do not in the context of the enhanced standard of review justify reversal of defendant's murder conviction. Finally, I continue to believe that constitutional standards and principles of fundamental fairness impugn our capital murder-death penalty statute as enacted, as interpreted, and as applied, and thus cannot join the majority's opinion but would concur in its result, with the noted exception of the aggravated sexual assault conviction.

Justices HANDLER and POLLACK, concurring in part and dissenting in part.

*For affirmance in part, reversal in part and remandment* —Chief Justice WILENTZ, and Justices CLIFFORD, O'HERN, GARIBALDI and STEIN—5.